2004-NMCA-134

103 P.3d 39

Elaina BROOKS, Lesley Donovan, Vikki and Mike Mayhew, individually and on behalf of all others similar situated, Plaintiffs–Appellants,

v.

NORWEST CORPORATION (n/k/a Wells Fargo & Co.); Norwest Services, Inc.; and Norwest Bank of New Mexico, N.A., Defendants–Appellees.

No. 23,423.

Court of Appeals of New Mexico.

July 23, 2004.

Certiorari Denied, No. 28,870, Dec. 7, 2004.

Philip C. Gaddy, David J. Jaramillo, Albuquerque, NM, for Appellants.

W. Spencer Reid, Gary J. Van Luchene, Keleher & McLeod, P.A., Albuquerque, NM, for Appellees.

## *OPINION*

BUSTAMANTE, Judge.

{1} Plaintiffs appeal the district court's decision denying class certification under Rule 1–023 NMRA 2004. The appeal raises several issues, including the legal standards for determining whether a class definition is legally sufficient and the standards under which the predominance and superiority criteria of Rule 1–023(B)(3) are tested with regard to manageability. We also review the decision for substantial evidence. We affirm the district court.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

{2} Plaintiffs sued Defendants (Norwest) on behalf of themselves and others who have held checking accounts with Norwest Bank New Mexico (Norwest–NM) alleging violations of the Unfair Practices Act (UPA), NMSA 1978, § 57–12–3 (1971), breach of the covenant of good faith and fair dealing under the Uniform Commercial Code (U.C.C.), NMSA 1978, § 55–1–203 (1961), and breach of contract. While the initial complaint sought certification of a class covering only New Mexico residents, the First Amended Complaint (FAC) requested approval of a multistate class including members from twelve additional states. Defendants moved the district court for an order denying multistate class certification on March 24, 2000. Before that motion was heard, Plaintiffs filed their motion for class certification, request-

ing approval of three sub-classes: one sub-class for persons or entities in New Mexico and two sub-classes based on multistate membership. As a matter of efficiency, the district court heard oral arguments on the proposed multistate class certification first, and denied it on June 12, 2000. Perhaps with an eye to expediting matters, Plaintiffs declined the court's invitation for an evidentiary hearing on the motion for state class certification. Instead, the parties presented oral argument on the motion on August 30, 2000, submitting exhibits that consisted primarily of interrogatories, deposition excerpts, and documents obtained in discovery. A letter decision denying Plaintiffs' motion for state class certification was entered by the district court on July 26, 2002. On July 29, 2002, the district court entered an order and findings of fact and conclusions of law denying the multistate class, and a separate order with findings of fact and conclusions of law denying state class certification. Plaintiffs take their appeal solely from the order denying state class certification.

{3} In their motion, Plaintiffs sought certification of:

All persons and/or entities in New Mexico who have incurred insufficient funds or overdraft charges as a result of Norwest posting withdrawals in a highest dollar amount to lowest dollar amount sequence. The claims of these Class Members are based on violations of the New Mexico Unfair Trade Practices Act and breach of

[Low to High] Posting Order

. . .

$10.00 (Pay)
$25.00 (Pay)
$25.00 (Pay)
$40.00 (Pay)
$50.00 (OD Notice)
$60.00 (OD Notice)

Under this scenario, assuming a beginning account balance of $100, a customer would pay two OD/NSF fees for checks posted on the same day under a low-high posting order compared to five such fees under a high-low sequence. Plaintiffs assert that Norwest projected this new policy would increase revenues by over $18,000 per month, "a conservative 6% increase," at Norwest–NM alone.

contract under common law and applicable U.C.C. provisions imposing obligations of good faith and fair dealing.

The factual basis for Plaintiffs' claims rests on the order in which checks are paid from a customer's account on a daily basis (posting order). There are several ways a bank can post checks, including for example, random order, order of presentation (the order checks are physically received on any given day), check number sequence, descending amount, and ascending amount. Plaintiffs allege that prior to September 1996, Norwest–NM posted checks in ascending order, from the lowest amount to the largest amount (low-high). Plaintiffs contend that in late 1994, after a review by a subsidiary, Norwest branches in various states began posting checks in descending order, from the highest amount to the lowest amount (high-low). It is undisputed that Norwest Bank–NM adopted the high-low policy in September 1996.

{4} According to Plaintiffs, Defendants' motive in adopting the high-low policy was not for legitimate business purposes but was driven solely by a desire to force more overdraft and insufficient fund (OD/NSF) events to generate more fees and increase revenues. Plaintiffs rely on Norwest documents that allegedly discuss the financial benefits and projected revenues that would result from posting checks high-low. Norwest's own internal memoranda sets forth the following comparison:

[High to Low] Posting Order

. . .

$60.00 (Pay)
$50.00 (OD Notice)
$40.00 (OD Notice)
$25.00 (OD Notice)
$10.00 (OD Notice)
$10.00 (OD Notice)

Plaintiffs' position is that Norwest breached its contract with customers by failing to post items for which there were sufficient funds available in a sequence that allowed the items to be paid, resulting in additional OD/NSF fees.

{5} The crux of Plaintiffs' statutory UPA and bad faith claims is that Norwest know-

ingly failed to disclose or adequately explain to its customers its decision to change the ordering policy, the reason for the new policy, or its consequences for the customer. Plaintiffs contend that when Norwest decided to implement the new method, customers were not notified of the new posting order and the deposit agreement did not reflect the change because Norwest wanted to avoid public criticism, adverse customer reactions, and potential lawsuits.

{6} Norwest's initial response is that it is lawful for them to post checks "in any order." NMSA 1978, § 55-4-303(b) (1992). It points out that the "no priority rule" is

> justified because of the impossibility of stating a rule that would be fair in all cases, having in mind the almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and other variables.

*Id.* official cmt. 7. The significance of this rule to Norwest's position appears to be two-fold: the first goes to the merits—notice is not required because any posting order is lawfully discretionary; and second, for purposes of certification, the Rule's official comment suggests that the effect of a posting order inherently varies from consumer to consumer, account to account. The latter supports Norwest's argument that Plaintiffs' class is too indefinite, individual issues of liability and damages predominate, and case management is impossible.

**Standard of Review**

[redacted] {7} Within the confines of Rule 1-023, the district court has broad discretion whether or not to certify a class. *Berry v. Federal Kemper Life Assurance Co.*, 2004-NMCA-116, 136 N.M. 454, 99 P.3d 1166. We decline Plaintiffs' invitation to apply a "less deferential standard" where the district court has denied certification. One circuit that applies a less deferential standard reasons that there is little difference between a review for abuse of discretion and a review for error, and that the judge's discretion is bounded by applicable rules of law or equity. *Abrams v. Interco Inc.*, 719 F.2d 23, 28 (2d Cir.1983). In New Mexico, however, a district court abuses its discretion when it misapprehends the law or if the decision is not supported by substantial evidence. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶¶ 6-7, 127 N.M. 654, 986 P.2d 450. Although a misapplication of the law is considered an abuse of discretion, our courts review de novo the initial decision of whether the correct legal standard has been applied. *Id.* ¶ 7. If the correct law has been applied to the facts, the district court's decision must be affirmed when it is supported by substantial evidence. *See id.* ¶ 8; *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153 (stating that appellate courts review district court's findings of fact for substantial evidence; "[a]n abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case."). We find no need to deviate from this standard.

**General Considerations**

{8} We begin our analysis by noting that Rule 1-023(A) and, in particular (B)(3), are essentially identical to their federal counterparts. Hence, we can look to the federal law for guidance in determining the appropriate legal standards to apply to the Rule. *See Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 10, 125 N.M. 376, 961 P.2d 1283.

[redacted] {9} When assessing whether to certify a class action, the district court should bear in mind the twin objectives of the Rule. The core policy behind the Rule is to provide a forum for plaintiffs with small claims who otherwise would be without any practical remedy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). At the same time, the district court must ensure that a class action is not only efficient, but that it is a fair method to all parties, including absent class members and defendants. *Id.* at 615, 117 S.Ct. 2231. Hence, the district court must engage in a rigorous analysis of whether the Rule's requirements have actually been met. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160-61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). At times the issues may be plain enough for the court to make its determina-

tion only on the pleadings. If need be, however, the district court may probe behind the pleadings and forecast what kind of evidence may be required or allowed at trial. *See id.* Of course, the court must bear in mind that plaintiffs are not required to prove their case at the certification stage. Thus, certification is not an appropriate time to examine the merits. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (holding certification is not an occasion for inquiry into the merits); *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir.2001) (noting that despite the rigorous analysis requirement, "a motion for class certification is not an occasion for examination of the merits") (internal quotation marks and citation omitted).

■ {10} Plaintiffs bear the burden to show that all four prerequisites of Rule 1–023(A) and at least one of the requirements of Rule 1–023(B) are met. *Amchem Prods., Inc.,* 521 U.S. at 613–14, 117 S.Ct. 2231; *O'Connor v. Boeing N. Am., Inc.,* 184 F.R.D. 311, 318 (C.D.Cal.1998). Failure to establish any one requirement is a sufficient basis for the district court to deny certification. *Neumont v. Monroe County,* 198 F.R.D. 554, 556 (S.D.Fla.2000); *Coleman v. Cannon Oil Co.,* 141 F.R.D. 516, 520 (M.D.Ala.1992).

{11} To satisfy Rule 1–023(A), Plaintiffs must establish four prerequisites, commonly referred to as numerosity, commonality, typicality, and adequacy:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

To qualify as a Rule 1–023(B)(3) class, as Plaintiffs desire, they must establish *both* "predominance" *and* "superiority." *Amchem Prods., Inc.,* 521 U.S. at 615, 117 S.Ct. 2231. This means that

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d) the difficulties likely to be encountered in [its] management.

Rule 1–023(B)(3).

**Analysis**

{12} In its letter decision, the district court found that Plaintiffs failed to identify an objectively ascertainable class, primarily because Plaintiffs did not propose a baseline of OD/NSF fees for which Norwest would not be liable. Nonetheless, in order to continue its analysis, the district court assumed that the class included persons or entities that had incurred OD/NSF fees as a result of Norwest posting withdrawals from highest to lowest dollar amount instead of either lowest to highest amount or check number sequence. Using its assumption, the district court found that Plaintiffs met the numerosity and commonality requirements of Rule 1–023(A). The court concluded that Plaintiffs' claims were not typical of members who were subject to counterclaims. Rather than denying certification, the district court excluded those members but noted that their exclusion would add substantial difficulties in ascertaining the class. The district court also excluded Plaintiff Donovan, whom it concluded was an inadequate class representative because of her problems with memory and reading comprehension.

{13} With respect to Rule 1–023(B)(3) requirements, the district court found that Plaintiffs failed to meet their burden to show predominance and superiority. While agreeing that Plaintiffs met some of the Rule 1–

023(B)(3) factors, the court concluded that, notwithstanding a strong public policy in favor of certification in the consumer protection area, the difficulties likely to be encountered in management were "almost or totally insurmountable." The court concluded, in summary:

> [P]laintiffs' motion for class certification should be denied because a) plaintiffs have not provided a class definition which is capable of present ascertainment; b) plaintiffs' proposed definition includes members subject to counterclaims, thereby defeating typicality; c) Ms. Donovan cannot adequately represent the class; and d) individualized liability issues predominate over common issues, making management of the class extraordinarily difficult.

{14} Plaintiffs interpret the district court's decision to mean that they established all of the requirements of Rule 1–023(A) and three of the four factors of Rule 1–023(B)(3), but failed on one ground, manageability. In their view, this was error because there is no practical alternative to litigate their relatively small claims, and because the reasons identified by the court were not legally sufficient.

{15} In Plaintiffs' view, when there is no reasonable alternative to class litigation, such as here, the district court must find management is impossible based on "hard data" to warrant denial of class certification. Plaintiffs advocate that the district court should be required to (1) express any management difficulties in its findings, explore solutions, and describe its efforts to resolve them; (2) indulge in a presumption against dismissal; (3) state the alternatives and reasons why other methods of adjudication would be superior to a class action; and (4) deny certification only if "hard evidence" establishes that it is impossible to resolve them. Plaintiffs contend the court erred because it did not comply with these standards. Plaintiffs contend the district court erred as a matter of law because the reasons it articulated did not satisfy the "impossibility standard." They also take issue with the legal standards the district court applied to its analysis of the class definition and the predominance re-

quirements, and they maintain that these reasons are not a valid basis for denial.

{16} We disagree with Plaintiffs' perception that the district court's decision was based simply on manageability difficulties. Despite the presumption it applied in favor of certification, the district court concluded Plaintiffs' evidence was insufficient in that it did not provide a reliable way to identify class members, and because individual liability issues promised to overwhelm the lawsuit, thereby making the class unmanageable and not superior. Since neither party disputes the district court's findings as to Rule 1–023(A) requirements, we limit our analysis to the class definition and Rule 1–023(B)(3) requirements. Our analysis of these two issues subsumes the "member preference" issue listed by the district court as a separate basis for denial. Because we find the grounds for the district court's decision are otherwise sufficient, we decline to address the issue of whether potential counterclaims might make this case less manageable.

### Class Definition

■ {17} Plaintiffs define the class as "all persons and/or entities in New Mexico who have incurred insufficient funds or overdraft charges as a result of Norwest posting withdrawals in a highest dollar amount to lowest dollar amount sequence." The district court found that Plaintiffs failed to meet their burden to "identify an objectively ascertainable class." It further found that "[a]ny definition of the class, . . . is not capable of present ascertainment[:][c]lass member identification would be nearly impossible [and] . . . even [ascertaining] the number of class members would be a labor intensive and enormously costly undertaking."

{18} Plaintiffs believe their definition survives because it proposes an objective "but for" test—a class of persons who were charged OD/NSF fees that could not have been imposed *but for* Norwest switching to a high-low posting order. They argue that the district court added ambiguity to the definition when it modified it to include "all persons or entities in New Mexico who have incurred [OD/NSF fees] as a result of [Norwest's] posting of withdrawals from highest-

to-lowest dollar amount instead of either lowest-to-highest amount or check number sequence." Plaintiffs further claim that members could be "readily determined" from Norwest's records but that the district court prevented their discovery. According to Plaintiffs, the fact it was labor intensive and costly did not make it impossible to ascertain the class, and the district court erred as a matter of law because this was an invalid reason for denial.

{19} Finally, even if their definition fails, Plaintiffs view it as the district court's function and duty to determine the extent of class membership and to work with the parties to construct a proper class definition, rather than simply dismiss the case. Plaintiffs view the district court's conclusion that it was enormously uneconomical in terms of time and money as a "flimsy" reason that violated their constitutional right to access courts.

■ {20} We conclude that the district court applied the correct legal standard to the class definition and that its analysis was supported by substantial evidence. An "implicit primary requirement" of Rule 1–023, often referred to as the "definiteness" requirement, is that plaintiffs bear the burden to demonstrate the existence of an identifiable class that is "capable of ascertainment under some objective standard." *Neumont*, 198 F.R.D. at 556–57 (internal quotation marks and citation omitted); *see Alliance to End Repression v. Rochford*, 565 F.2d 975, 978 (7th Cir.1977) (citing multiple circuits); *Caroline C. v. Johnson*, 174 F.R.D. 452, 459 (D.Neb.1996) ("Although not specifically mentioned in the rule, the definition of the class is an essential prerequisite to maintaining a class action.") (quoting *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir.1976)); *accord Earnest v. Gen. Motors Corp.*, 923 F.Supp. 1469, 1473 (N.D.Ala.1996); *Harris v. Gen. Dev. Corp.*, 127 F.R.D. 655, 658 (N.D.Ill. 1989); *Thomas v. Clarke*, 54 F.R.D. 245, 248 (D.Minn.1971). "It is critical that the class represented is ascertainable since the outcome of the class action is res judicata as to all unnamed class members." *Harris*, 127 F.R.D. at 658; *Alliance to End Repression*, 565 F.2d at 978 n. 6. Hence, class membership "must be capable of ascertainment un-

der some objective standard so that the court may insure that the interests of the class are adequately represented." *Caroline C.*, 174 F.R.D. at 459 (internal quotation marks and citation omitted).

{21} The class definition "provides the court with a framework with which to apply Rule 23 criteria and thus to reach an initial determination whether a class action may be maintained." 2 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 6:14 at 614 (4th ed.2002) (hereinafter Newberg). It also serves an important function in Rule 1–023(B)(3) class actions because it allows the court to determine who is entitled to notice. *Garrish v. United Auto., Aerospace, & Agric. Implement Workers of Am.*, 149 F.Supp.2d 326, 331 (E.D.Mich.2001). A Rule 1–023(B)(3) action compels "greater precision" defining the class than a Rule 1–023(B)(1) or (2) action. *O'Connor*, 184 F.R.D. at 319; *see Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir.1972) (noting that unlike Rule 23(b)(3) class actions where precise definition is important, less precise definition is required under Rule 23(b)(2) class actions because notice is not required); *accord Anderson v. Coughlin*, 119 F.R.D. 1, 3 (N.D.N.Y.1988); *see Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir.1970) (holding that in Rule 23(b)(2) action seeking injunctive and declaratory relief, class members do not need to be so clearly identified that they can be presently ascertained).

■ {22} This is not to say that the definition must be so precise that every potential member can be immediately identified or the precise number ascertained at the outset. *O'Connor*, 184 F.R.D. at 319; *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24, 34 (S.D.Cal.1975) (finding numerosity requirement was met where 50% of the class members could be identified by plaintiffs and the identity of other members could be made available). Nevertheless, given the notice requirement, it is especially incumbent on Rule 1–023(B)(3) plaintiffs to identify "a legally definable 'class' that *can be* ascertained through reasonable effort." *Earnest*, 923 F.Supp. at 1473 (emphasis added); *Abrams*, 719 F.2d at 30 (indicating that the manageability issue requires a look at the notice requirement,

and consideration of whether class members can be identified and the expense of doing so). "[T]he class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Garrish,* 149 F.Supp.2d at 330–31 (internal quotation marks and citation omitted); *Neumont,* 198 F.R.D. at 558; *O'Connor,* 184 F.R.D. at 319; 5 James Wm. Moore, et al., *Moore's Federal Practice* § 23.21[1], 23–56 to 23–57 n. 3 (3d ed.2003) (hereinafter Moore) (citing multiple circuits).

{23} Whether a class definition is legally sufficient depends on the facts of each case and must be determined on a case-by-case basis. *Alliance to End Repression,* 565 F.2d at 977; *Harris,* 127 F.R.D. at 658–59. As a general rule, definitions must bear some relation to defendant's activities. *O'Connor,* 184 F.R.D. at 319–20. At minimum, a definition should include a common transactional fact or status predicated on the cause of action, the appropriate time span, and geographical boundaries, if applicable, or other pertinent facts or characteristics that would make the class readily identifiable and capable of accurate verification. Newberg, *supra* § 6:17 at 631–32. When defining a class, Plaintiffs must avoid subjective criteria or circular definitions that depend on the outcome of the litigation. *Id.* § 6:14. Imprecise, vague, or broad definitions that include persons with little connection to the claims will fail to meet the definiteness requirement. *See Earnest,* 923 F.Supp. at 1473–74 (finding that the class definition was so vague and broad, the minimum standard of definiteness was not met); *see also Harris,* 127 F.R.D. at 659 (holding the class "too imprecise and speculative to be certified."). A subjective or merits-based definition can create manageability problems. Moore, *supra* § 23.21[1] at 23–57 n. 4.

{24} Critically, the class definition here lacks any objective criteria from which to gauge membership without first determining the merits of Plaintiffs' claims. First, it is overly broad because it would include any single OD/NSF event that resulted in a fee which would have been charged under any posting method. Second, Plaintiffs' proposed class of "[a]ll persons and/or entities in New Mexico who have incurred insufficient funds or overdraft charges as a result of Norwest posting withdrawals in a highest dollar amount to lowest dollar amount sequence" offers no guidance for the district court to gauge who is included and who is excluded from this class. The "but for the high-low posting" formula leaves a range of possibilities given the "almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and other variables." § 55–4–303(b) official cmt. 7.

{25} There is substantial evidence to conclude that there is no general method to determine who falls into this category. Norwest tendered evidence that, depending on the particular OD/NSF event, customers were sometimes charged more, sometimes charged less, and sometimes charged the same fees that they would have been charged under a low-high or check number sequence. As we will describe in more detail below, the evidence indicates that only an individual and thorough analysis of each member's account and a comparison to other methods would define who was in the class, even under a "but for" standard. Hence, the district court properly considered the administrative feasibility of such an endeavor, including the enormous time and expense involved. Newberg, *supra* § 4:35 at 307–08 (stating management issues associated with complexity and expense of notice are viable considerations).

{26} Economic feasibility aside, the highly individualized nature of the endeavor, together with all of the potential variables, including the bank officer's discretion to waive any fees, in whole or in part, and whether the bank would have waived fees under any other method, makes any class definition highly speculative and virtually impossible. As such, we find it was reasonable for the district court to conclude that Plaintiffs failed to meet their burden under the definiteness requirement.

{27} To the extent that Plaintiffs argue that the district court has an affirmative duty to define the class, we respond that

it is Plaintiffs who bear the burden to properly define the class or any subclasses; any duty on the court is discretionary. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 407–08, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14–15 (2d Cir.1993) (per curiam). We agree, however, that when possible, the district court should consider exercising its discretion to modify a proposed class definition or create subclasses, although it is under no obligation to do so in situations such as this case where it would be unduly burdensome. *Abrams,* 719 F.2d at 31 (holding that the district court is under no duty to devise a manageable class, especially where the difficulties with respect to notice and damages are staggering); *see Thomas,* 54 F.R.D. at 249 (holding that a court should use its discretion to define the class so that class action procedure can be utilized in close cases where certification is favored).

{28} Moreover, the district court did attempt to devise a viable class definition by adding objective criteria and excluding members. As it stated, "[t]he Court has struggled to discern a proper class definition, and is unable to, based on plaintiffs' failure to indicate what the proper method of posting would be." *See* Newberg, *supra* § 6:17 at 633 ("Courts may redefine the classes themselves, if they possess adequate information."). In this regard, the terms added by the court did not create any ambiguities, as Plaintiffs contend. It is the highly individualized nature of the case that renders this class incapable of definition. *See Lazar v. Hertz Corp.*, 143 Cal.App.3d 128, 191 Cal. Rptr. 849, 854 (1983) ("[W]hether there is an ascertainable class depends ... [on] the community of interest among class members) (internal quotation marks and citation omitted).[1]

{29} We also find Plaintiffs' claims that the district court impeded its discovery of a "readily identifiable" class to be without merit. This case was "vigorously" litigated by counsel, as Plaintiffs state, for over eighteen months prior to the certification hearing. Plaintiffs not only assured the court that they had all of the facts necessary for certification and that they were ready to go, it was Plaintiffs who urged the court to expedite the matter. In any event, we have found that the information necessary to ascertain membership is not "readily available" given the nature of Plaintiffs' claims and Norwest's records, and Plaintiffs proposed no method to extract and compile this information.

### Rule 1–023(B)(3) Requirements

█ {30} Plaintiffs' attempt to conflate the predominance and superiority issues into one criterion is flawed. Under Rule 1–023(B)(3), Plaintiffs must prove *two requirements:* "[c]ommon [issues must] predominate over any questions affecting only individual members[;] and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc.,* 521 U.S. at 615, 117 S.Ct. 2231 (internal quotation marks omitted). "These requirements reflect the fact that special caution must be exercised in class actions of this type because of the loose affiliation among the class members, which is thought to magnify the risks inherent in any representative action." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure. Civ.2d* § 1777 at 518 (1986) (hereinafter Wright). It is critical that "plaintiffs must prove *both* that common legal or factual questions predominate and that a class action is the best means of handling the litigation." *Coleman,* 141 F.R.D. at 521. Failure to establish either of these requirements is grounds for non-certification.

█ {31} Predominance tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation. *Amchem Prods., Inc.,* 521 U.S. at 623, 117 S.Ct. 2231. Put another way, predominance asks "whether the individual questions in a case are so overwhelming as to destroy the utility of the class action." *Partain v. First Nat'l Bank,* 59 F.R.D. 56, 59 (M.D.Ala.1973). The predominance inquiry focuses on the relationship between individual and common issues, which necessarily depends on the

---

1. We recognize that *Lazar* was decided under a statute that appears unique to California, but we believe the principle cited is applicable to Rule 1–023.

facts and circumstances of each case. *See In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D.Minn.1995) (stating that there are no bright lines to determine whether common questions predominate; instead, courts must consider the facts of each case). Consequently, it is essential for the court to understand the substantive law, proof elements of, and defenses to the asserted cause of action to properly assess whether the certification criteria are met. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996); *In re Potash Antitrust Litig.*, 159 F.R.D. at 693–94.

■■■ {32} Superiority, on the other hand, compares the fairness and efficiency of the class action to alternative methods of litigation. *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 757 (3d Cir.1974); *see* Wright, *supra* § 1779 at 552 (stating that a comparison of possible alternatives is required to "determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court"); *see also Partain*, 59 F.R.D. at 61 (finding that superiority is a comparative requirement that presumes the availability of alternatives). If no practical alternative exists, the superiority criterion is met, and the class should be certified unless the potential management difficulties are essentially insolvable. *In re Motor Vehicle Air Pollution Control Equip.*, 52 F.R.D. 398, 404 (C.D.Cal.1970); *see also City of Phila. v. Am. Oil Co.*, 53 F.R.D. 45, 72–73 (D.N.J.1971) (denying certification of class consisting of six million retail consumers on management grounds where distribution of any award would be "extremely difficult or almost impossible," even though its decision would leave many consumers without any remedy).

■■■ {33} Although Plaintiffs must establish both the predominance and superiority requirements, these criteria are also intertwined, and the manageability issue is relevant to both. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 n. 12 (11th Cir.1997); *Katz*, 496 F.2d at 762. Once predominance is determined, the superiority and manageability issues "fall into their logi-cal place." *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1044 (N.D.Miss.1993); *see In re Potash Antitrust Litig.*, 159 F.R.D. at 699–700 (holding that a showing that common issues predominated also established superiority and a presumption against dismissal for management reasons). If predominance is met, courts generally find that the class action is superior and will grant certification, even if the case presents difficulties in management, unless the problems are insurmountable. *Id.; see In re Catfish Antitrust Litig.*, 826 F.Supp. at 1044–45; *Coleman*, 141 F.R.D. at 529; *Partain*, 59 F.R.D. at 60. The more individual issues that predominate, the less superior and the more unmanageable the class action. *Castano*, 84 F.3d at 745 n. 19; *see Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023–25 (11th Cir.1996) (reversing class certification where predominance of individual issues in classes made the case unmanageable); *Newberg*, *supra* § 4:32 at 283 (given the close relationship between the predominance and superiority issues, a court is most likely not to find that superiority is met when common issues do not predominate because of the management difficulties presented by individual questions). When individual issues predominate over common issues, a class action is neither fair nor efficient, and regardless of the impracticability of individual litigation, the certification must fail. *Jackson*, 130 F.3d at 1006 n. 12 (noting that when individual issues predominate, the class action is singularly inefficient and unjust).

■■■ {34} The court's discretion is paramount when it determines whether a class action is manageable. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 141 (indicating that the certification issue is peculiarly within the discretion of the trial court as management is "always a matter of justifiable and serious concern for the trial court") (internal quotation marks and citation omitted); *Coleman*, 141 F.R.D. at 529 (holding that discretion to determine superiority issue is paramount). There is a whole range of practical problems that may render the class action inappropriate in any given case. *Eisen*, 417 U.S. at 164, 94 S.Ct. 2140. Several factors include class size,

whether notice can reasonably be effected, and the overwhelming presence of individual issues. *Partain*, 59 F.R.D. at 61; Wright, *supra* § 1780 at 574–85. Although the dismissal of a class action because of management difficulties is generally disfavored, *In re Potash Antitrust Litig.*, 159 F.R.D. at 700, dismissal is warranted where individual issues predominate to make the class action unmanageable, even if no alternative remedy exists. *Amchem Prods., Inc.*, 521 U.S. at 615, 117 S.Ct. 2231.

### The District Court Decision

■ {35} With these principles in mind, we conclude that the district court properly applied the law to its analysis of the Rule 1–023(B)(3) requirements. The court found that Plaintiffs failed to carry their burden that common issues predominate. It found there were crucial issues as to liability that would require individualized determinations, including what oral or written disclosures were made, the date when members learned or were put on notice of the posting order change, a determination of any individual adjustments to the posting order by Norwest's staff, and the fact that some members prefer the high-low posting order. The court concluded that these factors, together with the difficulties in determining which members were subject to counterclaims, presented management difficulties that were "almost or totally insurmountable."

{36} Although the district court identified some of the crucial liability issues that would require individual determinations, it did not identify Plaintiffs' required proof or how the individual issues related to that proof. While we do not find the district court's omissions are fatal in this case, we nevertheless remind the district courts that given the highly deferential standard under which we review class certification, and the inherent complexities of the issue, the court should be as specific as possible in its findings of fact and conclusions of law. *State v. Ferguson*, 111 N.M. 191, 193, 803 P.2d 676, 678 (Ct.App. 1990). Although failure to be specific is not necessarily reversible error, it is preferable for the court to identify the issues and "place on record the circumstances and factors that

were crucial to [its] determination .... so that counsel and the reviewing court will know and be in a position to evaluate the soundness of [its] decision." *Id.* Although the district court identified the legal standards it applied and provided the general reasons for its decision, it would have been helpful to identify at least the essential elements of Plaintiffs' claims and facts it relied on in reaching the decision. Despite these shortcomings, however, we find the record is sufficient for our purposes.

### Plaintiffs' Legal Claims

■ {37} Plaintiffs allege that Norwest knowingly deceived and defrauded Plaintiffs by using unfair, deceptive and/or unconscionable trade practices as a regular part of their business practices. According to Plaintiffs, the applicable statutory provisions arise under NMSA 1978, Section 57–12–2(D) (1999):

Any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale ... or services ... by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person and includes [but is not limited to]:

. . .

(14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

(15) stating that a transaction involves rights, remedies or obligations that it does not involve;

(16) stating that services ... are needed if they are not needed; or

(17) failure to deliver the quality or quantity of goods or services contracted for.

and Section 57–12–2(E):

[A]ny act or practice in connection with the sale ... of any ... services ... or in the extension of credit or in the collection of debts which to a person's detriment:

(1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

(2) results in a gross disparity between the value received by a person and the price paid.

Plaintiffs have identified the deceptive practices as: a failure to notify class members of the decision to change the posting order policy to a high-low sequence, and a failure to fully disclose and/or explain the purpose or practical effects of this policy. To prove their claim at trial, Plaintiffs must first establish that Norwest had a duty to disclose material facts reasonably necessary to prevent any statements from being misleading. *Smoot v. Physicians Life Ins. Co.*, 2004–NMCA–027, ¶ 15, 135 N.M. 265, 87 P.3d 545.[2] Plaintiffs must also show that (1) Norwest made

> an oral or written statement . . . that was either false or misleading; (2) the false or misleading representation must have been knowingly made in connection with the sale . . . or services; (3) the conduct complained of . . . occurred in the regular course of [Norwest's business]; and (4) the representation . . . may, tends to or does, deceive or mislead any person.

*Ashlock v. Sunwest Bank of Roswell, N.A.*, 107 N.M. 100, 101, 753 P.2d 346, 347 (1988) (internal quotation marks and citation omitted); *Russey v. Rankin*, 911 F.Supp. 1449, 1459–60 (D.N.M.1995) (internal quotation marks and citation omitted). Plaintiffs as a class must also establish causation—that Norwest's failure to disclose the new posting method, its reasons, and its effects caused Plaintiffs to suffer "actual damages." *See* NMSA 1978, § 57–12–10(B), (E) (1987) (limiting the award for unnamed plaintiffs in a class action to actual damages, while allowing named plaintiffs to collect statutory and treble damages); *see also* UJI 13–1707 NMRA 2004 (instructing that plaintiffs "may recover damages proximately caused by the deception.").

{38} Under Plaintiffs' breach of contract theory, they must prove that by the terms of their depositor agreements, Norwest "agreed to post items for which there were sufficient funds available;" that it "breached the contract by failing to post items for which there were sufficient funds available in a sequence or order that allowed for the items to be paid, and . . . additional fees on posted items [were charged as a result of the high-low posting order]". To establish both liability and a breach of contract in this case, Plaintiffs would be required to prove for each member that (1) an OD/NSF event occurred as a result of multiple checks being presented; (2) fees were charged; (3) more fees were incurred than under some alternative ordering method; and (4) the fees were not waived or refunded. Plaintiffs have provided no evidence to suggest that it can establish these elements by generalized proof. To the contrary, there is substantial evidence that each of these elements will require highly individualized proof.

{39} To recover punitive damages for a breach of contract, Plaintiffs must establish a cause of action for breach of the covenant of good faith and fair dealing. *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 212, 880 P.2d 300, 309 (1994). To establish a breach of the duty of good faith and causation, Plaintiffs must prove that Norwest wrongfully withheld the benefit of its contract with Plaintiffs, to Plaintiffs' detriment, with deliberate disregard to the potential harm to Plaintiffs, and without just cause or excuse. *Paiz*, 118 N.M. at 212–13, 880 P.2d at 309–10; *see Smoot*, 2004–NMCA–027, ¶ 13, 135 N.M. 265, 87 P.3d 545 ("The implied covenant is breached only when [a defendant] seeks to . . . withhold its benefits from [a plaintiff].") (internal quotation marks and citation omitted); *Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990); Whether the implied covenant was breached is a question of fact that focuses on the contract and what was agreed to. *Gilmore v. Duderstadt*, 1998–NMCA–086, ¶ 24, 125 N.M. 330, 961 P.2d 175. Finally, Plaintiffs must establish the actual damages they sustained as a result of the breach. *Id.* ¶ 25.

{40} The individual issues identified by the district court are relevant to each of these claims, and its decision that they would require individual proof is supported by sub-

---

**2.** The requisite proof for materiality is unclear under the current law. For purposes of this opinion, we assume there is a presumption that any omissions were material.

stantial evidence. The critical issues of whether Norwest breached its duty under the UPA by failing to disclose the new policy to its customers, and whether that omission was made in bad faith will require proof of whether and when members received notice of the high-low policy. Individual preferences for one posting order over another goes to the issue of contract formation: what was agreed to, customers' "reasonable expectations," and whether Norwest acted in bad faith. *Id.* ¶¶ 28–29 (discussing whether there was a bad faith breach of contract, the court noted that bad faith "undermine[s] the stability of expectations essential to contractual relationships") (internal quotation marks and citation omitted). Customer preferences for one method over another also relate to causation—whether the omission was "detrimental" to class members who might actually prefer that method.

{41} There was substantial evidence to support the district court's conclusion that individualized determinations would be required to establish what type of notice was given, when it was given, and that individual preferences varied between members. Norwest presented evidence that written disclosures were made at various times: effective August 1997, Norwest–NM published notice in its deposit agreement that it could "pay items presented against your account in the order of highest dollar amount to lowest dollar amount," and, on October 21, 1998, the agreement notified customers that "[t]he Bank may pay Items presented against your account in any order it chooses, including highest dollar amount to lowest dollar amount." Given that the extent of any customer's knowledge, experience, and capabilities inevitably vary among customers, and the personal nature of their relationship with a bank, it was reasonable for the district court to conclude that oral disclosures were sometimes made to customers. or even that customers discovered the policy on their own initiative. In fact, the evidence established that the class representatives became aware of the high-low posting order at different times and under different circumstances. There was also evidence that individual preferences varied; one Plaintiff preferred check number sequence, another preferred order of receipt, and a third preferred any method that caused the least number of checks to bounce.

{42} There is other evidence in the record supporting the district court's decision that the case would require a myriad of individualized determinations. *Meiboom v. Watson,* 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 (stating trial court's decision may be affirmed on any ground that is not unfair to appellant when it is supported by substantial evidence). First, there was evidence that the high-low sequence does not always result in more fees than other methods. Depending on any combination of factors, including check amounts, account balances, ordering method employed, and, as the district court correctly pointed out, the bank officer's discretion, customers might expect to pay the same or more fees under the check number sequence or low-high sequence methods as they would under the high-low posting order. A former Norwest–NM bank officer testified by affidavit that he compiled and analyzed some of the named Plaintiffs' account statements, but:

> I perceive no pattern in the fees incurred by the Plaintiffs versus the fees they might have paid under any other posting method which permits reliable generalization with respect to whether and to what extent proposed unnamed class members, individually or collectively, paid more fees than they might have paid had Norwest–NM employed alternative posting methods.

He opined that general conclusions about all accounts were impossible primarily because bank officers have substantial discretion to pay or return an item notwithstanding insufficient funds and there are several individual considerations, unique to each account, that are factored into a decision to charge or waive a fee. There was also evidence from an NSI employee that while Norwest–NM maintained computerized records dating back to May 17, 1997, it has no means to electronically access the records from this point back to September 1, 1996. These records, she testified, are on microfiche and a manual review of some 150,000–200,000 records would be required. In addition, she attested to the fact that the current computer system

was not subject to manipulation to determine whether a customer paid more fees under a high-low policy than under any alternative methods on a day-by-day basis, over the course of dealings in any account. She further opined that it might be possible to develop a program to compile a list of all members who had two or more OD/NSF events, but that a manual review of each account and comparison of alternative posting methods would still be required to establish whether those events were the result of high-low posting. According to her, this process still would not determine whether a customer actually paid two or more fees. Although, in her opinion, this information may be compiled from audit reports, each account would have to be manually reviewed for several months after each OD/NSF event to determine whether any fees were refunded, and each event would have to be individually analyzed to determine whether more fees were paid under the high-low method than under other methods. This still would not account for whether the bank officer might employ the same discretion if another posting method were used.

{43} Even if Norwest's "course of conduct" might be the type of generalized evidence necessary to establish the duty elements as Plaintiffs contend, we conclude that there was sufficient evidence to determine that significant and complex individual issues of liability dominate this class action. *Griffin v. Guadalupe Med. Ctr., Inc.*, 1997–NMCA–012, ¶ 22, 123 N.M. 60, 933 P.2d 859 ("When the trial court's findings of fact are supported by substantial evidence, ... refusal to make contrary findings is not error.").

### Superiority

{44} Plaintiffs' failure to establish that common issues predominate and the difficulty with identifying the class are sufficient to deny certification, without addressing superiority. *See Amchem Prods., Inc.*, 521 U.S. at 615, 117 S.Ct. 2231. For the sake of completeness, however, we address the issue and find that the district court was reasonable to conclude that a class action was not a superior method of adjudication.

{45} Plaintiffs emphasize that their claims are too small to justify the cost of individual actions so there is no other practical alternative to litigate their claims. We disagree with the premise that there is no other practical alternative. It is entirely feasible for Plaintiffs to bring their claims individually under the UPA. Theirs is the very type of claim the legislature envisioned when it enacted the UPA. *See Jones v. Gen. Motors Corp.*, 1998–NMCA–020, ¶ 25, 124 N.M. 606, 953 P.2d 1104 (observing that the UPA encourages consumers to initiate, and attorneys to handle, claims where the amounts recoverable are small); *see also Ashlock*, 107 N.M. at 102, 753 P.2d at 348 (interpreting UPA to ensure its broad application to innocent consumers is protected). Significantly, Plaintiffs' argument concerning the prohibitive cost of bringing individual suits is belied by the fact that the UPA awards attorney fees and costs to a successful litigant. *See* § 57–12–10(C). Plaintiffs may also recover the greater of actual damages or statutory damages ($100), even if "[p]roof of monetary damage, loss of profits or intent to deceive or take unfair advantage of any person" cannot be established. § 57–12–10(A),(B); *Jones*, 1998–NMCA–020, ¶ 23, 124 N.M. 606, 953 P.2d 1104. Where plaintiffs establish that the deceptive or unconscionable trade practice was willful, they may collect treble actual or statutory damages, whichever is greater. § 57–12–10(B). Individuals who sue under the UPA, as opposed to members who sue as a class, are entitled to collect more than their actual damage. § 57–12–10(E) (limiting the recovery of statutory and treble damages in class action to named plaintiffs). Conversely, any relief realized by class members is limited to actual damages; they are barred from collecting statutory or treble damages. *Id.* Hence, the UPA not only provides a remedy for Plaintiffs, it also appears to be less fair to those members to pursue their remedy as a class action.

{46} There are other significant benefits to individual actions under the UPA. First, the issues of whether a bank has a duty to disclose its posting order or whether an omission is unlawful appear to be questions that are common to the class. If Plaintiffs are successful in their individual claims,

these issues might be sufficiently established to collaterally estop Norwest from raising the same issue in subsequent litigations. *See Rex, Inc. v. Manufactured Housing Comm.*, 2003–NMCA–134, ¶ 5, 134 N.M. 533, 80 P.3d 470; *Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor*, 115 N.M. 159, 164, 848 P.2d 1086, 1091 (Ct.App.1993) ("New Mexico recognizes both defensive and offensive collateral estoppel."). The benefit is two-fold: first it would prevent the potential waste of judicial resources and costs adjudicating uncertain, novel issues in a class action; second, any subsequent litigations would be far less complicated and less costly. Damage issues are inherently less complex and costly on an individual basis than as a class action that requires compilation and analysis of hundreds of thousands of individual accounts. Plaintiffs will often have bank records, and discovering and analyzing their account history will be far less arduous a task than compiling and analyzing the multiple accounts in this case. In light of the foregoing, we find Plaintiffs' judicial access argument is without merit.

{47} We also disagree with Plaintiffs to the extent they would require the district court to make specific findings regarding the alternative methods of litigating Plaintiffs' claims and why such alternatives would be superior. Foremost, it is Plaintiffs' burden to establish that the class action is sufficiently effective to justify an expenditure of judicial time and resources and the risk of prejudice to class members who are not before the court. Second, the district court did consider individual actions as an alternative and concluded that an individual action was the only fair and efficient remedy for Plaintiffs. While we encourage the district court to be as specific as possible when it makes findings and conclusions, especially in a class action, the district court is not required to state the reasons why an alternative is superior, particularly in this case where denial of certification is proper in light of Plaintiffs' failure to satisfy the predominance test.

**CONCLUSION**

{48} In sum, we affirm the district court's decision to deny class certification in this proceeding. The district court applied the correct legal standards, and its decision is supported by substantial evidence in accordance with those standards.

{49} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.