**Certiorari Granted, February 13, 2012, No. 33,382; Certiorari Granted, March 30, 2012, No. 33,383; Certiorari Granted, March 30, 2012, No. 33,384**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-053**

**Filing Date: December 15, 2011**

**Docket No. 27,992 consolidated with Docket No. 29,016**

**STARKO, INC., d/b/a MEDICINE CHEST #1,
and JERRY JACOBS, d/b/a PILL BOX
PHARMACY #4, for and on behalf of
themselves and all others similarly situated,**

      **Plaintiffs-Appellants/Cross-Appellees,**

**v.**

**PRESBYTERIAN HEALTH PLAN, INC.,
a New Mexico corporation, d/b/a
PRESBYTERIAN SALUD,**

      **Defendant-Appellee,**

**and**

**CIMARRON HEALTH PLAN, INC.,
a New Mexico corporation, d/b/a
CIMARRON HEALTH MAINTENANCE
ORGANIZATION, a/k/a CIMARRON HMO,**

      **Defendant-Appellee/Cross-Appellant,**

**consolidated with**

**STARKO, INC., d/b/a MEDICINE CHEST #1,
and JERRY JACOBS, d/b/a PILL BOX
PHARMACY #4, for and on behalf of
themselves and all others similarly situated,**

      **Plaintiffs-Appellants,**

**v.**

**NEW MEXICO HUMAN SERVICES
DEPARTMENT,**

  **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Linda M. Vanzi, District Judge**

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Robert E. Hanson
Lauren Keefe
Elizabeth Radosevich
Albuquerque, NM

Cavin & Ingram, P.A.
Sealy H. Cavin, Jr.
Stephen D. Ingram
Albuquerque, NM

for Appellants/Cross-Appellees

Long, Pound & Komer, P.A.
John B. Pound
Santa Fe, NM
Rodey, Dickason, Sloan, Akin & Robb, PA
Edward Ricco
Albuquerque, NM

for Appellee Presbyterian Health Plan, Inc.

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Lisa Mann
Jennifer A. Noya
Albuquerque, NM

for Appellee/Cross-Appellant Cimarron Health Plan, Inc.

Gary K. King, Attorney General
Jerome Marshak, Special Assistant Attorney General
Eric R. Miller, Assistant Attorney General
Santa Fe, NM

for Appellee New Mexico Human Services Department

**OPINION**

**KENNEDY, Judge.**

{1}     Today, we update a continuing saga of Medicaid-related litigation spanning more than eleven years.[1]  Starko, Inc. and Jerry Jacobs are representatives of a certified class of pharmacists (collectively, Plaintiffs), who contend they were not properly reimbursed for their services under Medicaid.  They argue that the New Mexico Human Services Department (HSD) and managed care organizations, namely, Presbyterian Health Plan, Inc. and Cimarron Health Maintenance Corporation (collectively, the MCOs), which administered Medicaid for the State of New Mexico, were required to pay Plaintiffs in accordance with NMSA 1978, Section 27-2-16(B) (1984), but refused to do so.  In two consolidated appeals, Plaintiffs appeal four district court orders dismissing their claims against the MCOs and HSD for violation of Section 27-2-16(B), breach of contract, breach of contract on a third-party beneficiary theory, unjust enrichment, declaratory relief, and injunctive relief.

{2}     We hold that Section 27-2-16(B) confers upon participating Medicaid pharmacists an implied cause of action to enforce the statute directly against the MCOs.  Furthermore, (1) the district court properly dismissed Plaintiffs' claim concerning HSD's reduction of reimbursement without federal approval for a six- month period; (2) Plaintiffs' breach of contract claim, third-party beneficiary contract, and unjust enrichment claims may proceed; (3) the district court properly concluded that Section 27-2-16(B) conferred non-waivable rights; (4) the district court did not abuse its discretion in denying Plaintiffs' demands for injunctive and declaratory relief; and (5) the district court properly certified Plaintiffs' class in these cases.

{3}     Consequently, we affirm in part, reverse in part, and remand to the district court for proceedings consistent with this Opinion.

## I.     BACKGROUND

{4}     Congress created the Medicaid program in 1965 to supplement the Social Security Act.  *Atkins v. Rivera*, 477 U.S. 154, 156 (1986); *see* 42 U.S.C. § 1396w-2 (2009).  The program provides "medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care" and compels participating states to share the costs of administering the program with the federal government.  *Atkins*, 477 U.S. at 156-57.  New Mexico is a participant state.  Initially, New Mexico's Medicaid program operated on

---

[1]This appeal is the third and fourth we have decided in this case since 2005.  *See Starko, Inc. v. Cimarron Health Plan, Inc.* (*Starko I*), 2005-NMCA-040, 137 N.M. 310, 110 P.3d 526 (holding that Rule 1-023(F) NMRA was inapplicable to the issue of class certification); *Starko, Inc. v. Gallegos* (*Starko II*), 2006-NMCA-085, 140 N.M. 136, 140 P.3d 1085 (granting qualified immunity under 42 U.S.C § 1983 (1996) to individual defendants who were state executives during the transition from a fee-for-service model to a managed care model).

a fee-for-service model, in which Medicaid services were provided directly to recipients by HSD. More recently, in the interest of cutting costs, the state has significantly curtailed the fee-for-service model. Now, like most states, the greatest number of New Mexico's Medicaid recipients receive their treatment via a managed care program, in which the state contracts with the MCOs to provide services. *Starko II*, 2006-NMCA-085, ¶ 3. The MCOs then contract with pharmacists, either directly or through intermediaries called "Pharmacy Benefits Managers" (PBMs), and pharmacists, in turn, provide prescription medication to Medicaid recipients.[2] *Id.*

{5}     Section 27-2-16(B) governs how New Mexico's Medicaid program pays participating pharmacists. It was modified to its current form in 1984 and remains unchanged to the present day. Section 27-2-16(B) thus bridges New Mexico's transition from the original fee-for-service model to today's managed care and provides as follows:

> If drug product selection is permitted by [NMSA 1978, Section 26-3-3 (2005)], reimbursement by the [M]edicaid program shall be limited to the wholesale cost of the lesser expensive[,] therapeutic equivalent drug generally available in New Mexico plus a reasonable dispensing fee of at least three dollars [and] sixty-five cents ($3.65).[3]

Section 26-3-3, referenced in Section 27-2-16(B), allows Medicaid pharmacists in their professional discretion to substitute any "therapeutically equivalent" drug for the drug actually prescribed as long as the substitution conforms with federal guidelines. Section 26-3-3. Under fee-for-service Medicaid, HSD followed this requirement and paid pharmacists the wholesale cost of the lesser expensive drug plus an additional $3.65 for each transaction.

---

[2]Under managed care, Presbyterian has chosen to contract with pharmacists directly, while Cimarron uses PBMs as intermediaries. In Cimarron's case, it contracts with PBMs and requires PBMs to subcontract with pharmacists, who then provide services to Medicaid recipients on behalf of Cimarron. Though pharmacists do not contract directly with Cimarron, it is somewhat unclear from the record whether Cimarron, the PBMs, or both, truly exercise control over pharmacists. For instance, the contracts between Cimarron and PBMs impose a variety of conditions on pharmacists, while the contracts between PBMs and pharmacists provide that pharmacists will be paid by PBMs.

[3]Since the advent of managed care, Section 27-2-16(B) has been challenged twice in both the House and the Senate without success, once in 2002 and again in 2004. Both bills sought to restrict payments to pharmacists. *See* H.B. 400, 45th Leg., 2d Sess. (N.M. 2002) (not passed) (seeking to revise Section 27-2-16(B) by replacing the phrase "wholesale cost" with "lowest price available" and deleting the phrase "of at least three dollars sixty[-]five cents ($3.65)" (emphasis omitted)); *see also* S.B. 183, 46th Leg., 2d Sess. (N.M. 2004) (not passed) (seeking to declare "an emergency[,]" rewriting Section 27-2-16(B) to allow pharmaceutical payments to be set "by negotiation," and by "regulations adopted by the [HSD]" (emphasis omitted)).

**{6}** That began to change in 1994. At that time, the Legislature authorized HSD to transition from a fee-for-service to a managed care program and, in 1997, HSD implemented SALUD!, a managed care program, in which it entered into competitively bid contracts with the MCOs to provide care to Medicaid recipients. The contracts, known as Medicaid Managed Care Service (MMCS) Agreements required the MCOs to provide medical care and pharmacy services to all qualified Medicaid recipients. These contracts explicitly incorporated "[a]ll applicable statutes, regulations and rules implemented by the [f]ederal [g]overnment, the State of New Mexico . . . , and [HSD], concerning Medicaid services[.]" Shortly after the adoption of SALUD!, HSD notified pharmacists that, in order to continue to provide services under Medicaid, pharmacists would be required to contract with the MCOs instead of HSD. Under the new MCO-pharmacist contracts, pharmacists would be reimbursed by the MCOs at the "current and applicable Medicaid reimbursement rates" which, Plaintiffs allege, had the potential to be significantly lower than the statutory reimbursement rates guaranteed by Section 27-2-16(B). Yet, pharmacists wishing to participate in the program had no choice. Anyone who refused the new contracts would be "terminated from the active provider list" by HSD.

**{7}** Under SALUD!, pharmaceutical costs were negotiated directly between HSD and the MCOs, and Plaintiffs allege that, under the new regime, the MCOs were sufficiently paid by HSD to comply with Section 27-2-16(B). Fearing that their rights under Section 27-2-16(B) would be waived by agreeing to contracts with the MCOs, Plaintiffs filed suit against HSD and obtained a temporary restraining order from the district court. In essence, the district court gave HSD an ultimatum: either withdraw the requirement that pharmacists contract with the MCOs, or agree that the new contracts would not waive pharmacists' right to sue pursuant to Section 27-2-16(B). HSD chose the latter and, with other aspects of the litigation still pending against HSD, pharmacists entered into new contracts, either with the MCOs themselves or with the MCOs' intermediary, the PBMs. Plaintiffs claim that the reimbursable amounts ultimately paid under these contracts were often substantially lower than the amounts required by Section 27-2-16(B).[4] Likewise, they claim that HSD, by instituting this new regime, circumvented its obligations under the statute by using the MCOs as intermediaries.

**{8}** Over HSD's protests, Plaintiffs were certified as a class in October 1999. At that time, the MCOs had not yet been added as Defendants. In 2000, Plaintiffs moved for summary judgment, and the district court ruled that HSD was affirmatively required to comply with Section 27-2-16(B). It found that HSD could not "delegate or contract away" its responsibilities under the statute. Then, after winning on their summary judgment motion against HSD, Plaintiffs argued that the MCOs were indispensable parties. In October 2000, the district court allowed them to be added and held that, like HSD, the MCOs were required to comply with Section 27-2-16(B).

---

[4]The present appeal does not deal with any claims by Plaintiffs against the MCOs on breach of the contracts between Plaintiffs and the MCOs.

**{9}** The MCOs attacked the class certification. They filed briefs asking the court to decertify the class and included a number of supporting exhibits. As a result, the district court allowed discovery into "whether the class should be decertified." The MCOs never requested an evidentiary hearing on their motions, but oral arguments were heard in September 2002. After this second consideration of the class certification issue, the district court denied the MCOs' motions to decertify the class and found that the requirements of Rule 1-023 NMRA continued to be met. The MCOs appealed to this Court pursuant to Rule 1-023(F). We refused to consider the merits of their claim and held that an appeal under Rule 1-023(F) was unavailable. *See Starko I*, 2005-NMCA-040, ¶¶ 2, 18 (discussing the applicability of Rule 1-023(F)).

**{10}** It appears that such wrangling through the years has directly influenced the language of contracts between the parties. Most notably, contracts between HSD and the MCOs have taken several forms. The first contracts in 1997 simply required the MCOs to pay pharmacists in a manner consistent with "current and applicable . . . reimbursement rates." Then, in 2001, following the district court's order that HSD and the MCOs comply with Section 27-2-16(B), the contracts were changed to include what the parties now refer to as "the *Starko* [C]lause." That language provides that "[t]he subcontract for pharmacy providers shall include a payment provision consistent with [Section 27-2-16(B)] unless the subcontractor provides a voluntary waiver to any rights under" the statute. The contracts were again revised in 2005 when they took their current form. Those contracts alter the *Starko* Clause to require that "subcontracts for pharmacy providers shall include a payment provision consistent with [Section 27-2-16(B)] *unless there is a change in law or regulation*." (Emphasis added.) We emphasize that Section 27-2-16(B) has not changed since 1984.

**{11}** As these cases have progressed since the last appeal, three separate district court judges have issued a variety of orders. We review four.

**{12}** First, in 2006, Presbyterian filed a motion for judgment on the pleadings. Following the hearing, the district court affirmed its earlier ruling that HSD's affirmative duty to Plaintiffs under Section 27-2-16(B) was non-delegable. As such, any right of action under the statute would be most properly pursued against HSD, not the MCOs. Thus, the court held that any private right of action against the MCOs under the statute must fail. Likewise, the court held in favor of the MCOs on the issue of unjust enrichment. It found that Plaintiffs' contracts with the MCOs provided an "adequate remedy at law" against the MCOs, which precluded a cause of action in equity.

**{13}** Second, in 2007, Presbyterian filed a second motion for judgment on the pleadings, which Cimarron joined. Together, the MCOs sought rulings on Plaintiffs' claim for breach of the contracts between the MCOs and HSD. Following argument, the district court held that the claims were unfounded because Plaintiffs were not intended third-party beneficiaries of the contracts between the MCOs and HSD. Further, the court found that a third-party beneficiary claim would not lie against the MCOs even if Plaintiffs had been intended beneficiaries. The district court reasoned that "[t]o allow an action against the MCOs on a

third-party beneficiary theory would be inconsistent with th[is c]ourt's previous ruling that Plaintiffs have no private right of action."

**{14}** Third, in 2008, Plaintiffs filed a motion for summary judgment on the issue of when Section 27-2-16(B) applies. The court entered partial summary judgment, stating that the statute only applies when a pharmacist actually substitutes a lower cost, therapeutic equivalent drug for the prescribed drug.

**{15}** Fourth, in 2008, Plaintiffs submitted a motion for partial summary judgment on several issues with regard to their case against HSD. HSD responded with its own motion for summary judgment on the issues. The district court issued a memorandum opinion and order on the cross-motions for summary judgment. In it, the court held that (1) HSD had no obligation to pay Plaintiffs for the alleged shortfall, (2) HSD could not be held liable for past non-compliance with Section 27-2-16(B), (3) Plaintiffs did not have a breach of contract claim concerning HSD's reduction of reimbursement without federal approval for a six-month period, and (4) the $3.65 dispensing fee was reasonable.

**{16}** On appeal from these orders, Plaintiffs argue several points of error. First, they assert that Section 27-2-16(B) creates a private right of action enforceable against the MCOs and HSD. Furthermore, they argue the district court erroneously dismissed their claims for breach of contract, third-party beneficiary breach of contract theory, unjust enrichment, declaratory relief, and injunctive relief.

**{17}** Against any extent to which we reverse any portion of the district court's rulings in this matter, Cimarron asks us to consider its conditional cross-appeal. In it, Cimarron argues, first, that the district court's class certification in this case was both constitutionally and statutorily defective and, second, presuming Section 27-2-16(B) confers any rights at all, those rights have been waived.

## II.     STANDARD OF REVIEW

**{18}** When reviewing judgments on the pleadings, we "accept as true all facts well pleaded and question only whether the plaintiffs might prevail under any state of facts provable under the claim." *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 760, 750 P.2d 118, 121 (1988). All interpretations of law made by the district court are reviewed de novo. *Klinksiek v. Klinksiek*, 2005-NMCA-008, ¶ 4, 136 N.M. 693, 104 P.3d 559.

**{19}** We review orders granting or denying summary judgment de novo. *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280. "Summary judgment is proper when the material facts are undisputed and the only remaining issues are questions of law." *Farmers Ins. Co. of Ariz. v. Sandoval*, 2011-NMCA-051, ¶ 6, 149 N.M. 654, 253 P.3d 944 (internal quotation marks and citation omitted).

**{20}** We likewise apply a de novo standard when engaging in statutory interpretation. *State v. Smith*, 2009-NMCA-028, ¶ 8, 145 N.M. 757, 204 P.3d 1267; *see Sedillo v. N.M.*

*Dep't of Pub. Safety*, 2007-NMCA-002, ¶ 7, 140 N.M. 858, 149 P.3d 955 ("The question of whether statutes create or imply a private right of action is a question of law . . . reviewed de novo."). In doing so, we strive to effectuate the intent and policies of the Legislature, looking "first to the words chosen . . . and the plain meaning of the . . . language." *Smith*, 2009-NMCA-028, ¶ 8 (internal quotation marks and citation omitted). When a statute's language "is clear and unambiguous, we give effect to that language and refrain from further statutory interpretation." *Id.* (internal quotation marks and citation omitted). Where ambiguity arises, we go outside the plain language and engage in further statutory interpretation. *N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 11, 142 N.M. 248, 164 P.3d 947. We "construe the entire statute . . . so that all . . . provisions [are] considered in relation to one another." *Id.* (internal quotation marks and citation omitted). "In ascertaining legislative intent, we look not only to the language used in the statute, but also to the object sought to be accomplished and the wrong to be remedied." *Patterson v. Globe Am. Cas. Co.*, 101 N.M. 541, 543, 685 P.2d 396, 398 (Ct. App. 1984), *superseded by statute on other grounds as stated in Journal Publ'g Co. v. Am. Home Assurance Co.*, 771 F. Supp. 632, 635 (S.D.N.Y. 1991).

## III. DISCUSSION

### A. Plaintiffs Have Not Waived Claims Regarding Section 27-2-16(B)

**{21}** As a threshold issue, Defendants assert that Plaintiffs waived any claim they had regarding Section 27-2-16(B). Specifically, the MCOs argue that because Plaintiffs have entered into contracts for an amount less than the requirement in Section 27-2-16(B), Plaintiffs have waived any cause of action based upon Section 27-2-16(B). The MCOs contend that the district court, when it concluded that no waiver occurred, violated the principle of freedom of contract. Citing *United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 108 N.M. 467, 471, 775 P.2d 233, 237 (1989), Presbyterian supports its waiver argument with the principle that "[t]he voluntary relinquishment of a statutory protection is consistent with our policy favoring the right to contract." For reasons explained in this Opinion, we conclude that any semblance of a relinquishment was not voluntary in this case.

**{22}** In addition, HSD argues that, in the provider agreements it made with Plaintiffs, Plaintiffs agreed "[t]o accept as payment in full the amount paid in accordance with the reimbursement structure in effect for the period during which such services were provided as per 42 [C.F.R. §] 447.15." The Medicaid Payment for Services Rule, 42 C.F.R. § 447.15, provides that participation in the Medicaid program is limited to providers that "accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual." Thus, HSD contends that Plaintiffs cannot seek additional payments from HSD under the fee-for-service program because, "by agreeing to become Medicaid providers[, Plaintiffs] have agreed not to seek reimbursement from HSD beyond what is paid to them by HSD pursuant to its drug reimbursement regulations as then in effect." HSD further argues that as to SALUD!, "HSD included a provision in the MMCS Agreements[, stating that Plaintiffs] must accept payment from the MCO[s] as payment for any services included in the benefit package, and cannot

request payment from HSD or from Medicaid members . . . for services performed under the subcontract." (Internal quotation marks omitted.)

**{23}** We disagree with the contentions of both the MCOs and HSD that Plaintiffs' claims have been waived. In 1997, as stated above, Plaintiffs sought a temporary restraining order from the court to determine the effect of entering into new contracts with the MCOs. The court issued the order and required HSD to either allow Plaintiffs to refuse the new contracts, or agree that such contracts would not waive any rights under Section 27-2-16(B). HSD chose the latter, and Plaintiffs signed with the MCOs.

**{24}** This Court has explained in the past,

> a valid waiver requires a known legal right, relinquished for consideration, where such legal right is intended for the waivor's sole benefit and does not infringe on the rights of others. . . . In no case will a waiver be presumed or implied, contrary to the intention of the party whose rights would be injuriously affected thereby, unless, by his conduct, the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to. Absent proof of an express agreement, in order to establish waiver[,] there must be a showing of *unequivocal* acts or conduct on the part of the person against whom waiver is asserted showing an intent to waive.

*McCurry v. McCurry*, 117 N.M. 564, 567, 874 P.2d 25, 28 (Ct. App. 1994) (internal quotation marks and citations omitted). When we consider the actions taken by Plaintiffs to preserve their statutory rights through a court order and the change in position chosen at the time by HSD, we do not see these contracts they entered into with Defendants as *unequivocal* acts showing an intent to waive statutory rights.

**{25}** HSD's argument that Plaintiffs contractually waived their right to seek further compensation from HSD is inconsistent with HSD's agreement that Plaintiffs would not waive their statutory rights by engaging in contracts with the MCOs. Furthermore, entering into contracts with the MCOs can hardly be said to constitute an unequivocal intent to waive rights under Section 27-2-16(B), especially given Plaintiffs' refusal to enter the contracts without HSD's agreement and a court order that their rights would be preserved. Moreover, the contracts, which we discuss in further detail below, continue to require compliance with the Section 27-2-16(B) absent waiver or change of law.

**{26}** In addition, we will not imply waiver unless Defendants were misled by Plaintiffs' conduct to their prejudice, while honestly believing that Plaintiffs actually intended to waive their rights. *Brown v. Jimerson*, 95 N.M. 191, 192-93, 619 P.2d 1235, 1236-37 (1980); *see Ed Black's Chevrolet Ctr., Inc. v. Melichar*, 81 N.M. 602, 604, 471 P.2d 172, 174 (1970) ("In no case will a waiver be presumed or implied, contrary to the intention of the party whose rights would be injuriously affected thereby, unless, by his conduct, the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended or consented to."); s*ee also Brown v. Taylor*, 120 N.M. 302, 305, 901 P.2d 720, 723 (1995)

(holding that a theory of implied waiver must be supported by evidence that the aggrieved party acted in reliance on the waiver to his detriment). Here, the MCOs have presented no evidence that they were misled by Plaintiffs or that they entered into these contracts in reliance on Plaintiffs' alleged waiver. Neither has HSD demonstrated such reliance, and Plaintiffs have certainly demonstrated no such intent.

**{27}** Thus, we hold that the district court was correct when it concluded that Plaintiffs did not waive their rights under Section 27-2-16(B). We also note that the case before us involves a unique set of facts and, as the district court stated, "[n]one of the cases cited by [the MCOs] . . . deals with this unique situation in which a [s]tate program and [s]tate actors, who themselves must comply with the statute, can, by their own contracts with third parties, allow the statute to be ignored or violated." Having determined that Plaintiffs did not waive their right to sue under the statute itself or under contracts that incorporated the statute, we now discuss Section 27-2-16(B)'s role in the Medicaid program.

**B.      Section 27-2-16(B)**

**{28}** New Mexico's Medicaid program falls under the Public Assistance Act. *See* NMSA 1978, §§ 27-2-1 to -34 (1972, as amended through 2007). Under the Act, the HSD is charged with administering Medicaid and maintaining a "statewide, managed care system to provide cost-efficient, preventive, primary and acute care for [M]edicaid recipients." Section 27-2-12.6(A). In administering the Medicaid program, HSD must ensure that recipients are provided prescription medication. Section 27-2-12.11. Section 27-2-16(B) provides that "[i]f drug product selection is permitted by Section 26-3-3 . . . , reimbursement by the [M]edicaid program shall be limited to the wholesale cost of the lesser expensive[,] therapeutic equivalent drug generally available in New Mexico plus a reasonable dispensing fee of at least three dollars sixty-five cents ($3.65)." Titled "Compliance with federal law[,]" Section 27-2-16(B) most clearly effectuates the federal requirement that state medical assistance plans

> provide such methods and procedures . . . as may be necessary to . . . assure that payments are consistent with efficiency, economy, and quality of care and are *sufficient to enlist enough providers so that care and services are available* under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]

42 U.S.C. § 1396a(a)(30)(A) (1999, as amended through 2010) (emphasis added). Indeed, as Presbyterian recognizes in its answer brief, the statute is a response to Section 1396(a)(30)(A) and seeks "a balance between paying providers enough to assure patient accessibility and keeping Medicaid expenditures as low as possible."

**1.      Section 27-2-16(B) Survived the Transition to Managed Care**

**{29}** The MCOs argue that Section 27-2-16(B) did not survive New Mexico's transition to managed care. Even if it did, they claim the statute does not provide a remedy and is therefore unenforceable. As to whether Section 27-2-16(B) survived the transition to

managed care, the most apparent manifestation of our Legislature's intent to pay Plaintiffs for their stock and labor is the inescapable fact that the statute, setting the requirements for doing so, remains on the statute books despite the 2002 and 2004 attempts to change it. The requirement was first enacted in 1974 and has existed in its current form since 1984, predating the advent of managed care in New Mexico by more than a decade and surviving more than a decade past. *See* § 27-2-16(B); § 27-2-12.6(A). Yet, the MCOs argue that the requirement is inconsistent with managed care as implemented in 1997 because it sets an absolute amount for payment; whereas, managed care is premised upon periodic renegotiations between the MCOs and their subcontractors.

**{30}** The MCOs fail to demonstrate that the Legislature intended for Section 27-2-16(B) to be superseded by managed care. The Legislature twice rejected amendments that specifically would have either lowered payments or required periodic renegotiation. *See* H.B. 400, 45th Leg., 2d Sess. (N.M. 2002) (not passed); S.B. 183, 46th Leg., 2d Sess. (N.M. 2004) (not passed). It seems that the evidence is clearly contrary to the MCOs' argument.

**{31}** Nor are we persuaded by Cimarron's argument that the statute's very language demonstrates its inapplicability to managed care. Essentially, Cimarron claims that because Section 27-2-16(B) requires "reimbursement by the [M]edicaid program[,]" it cannot apply to them because they are not the Medicaid program. Cimarron's brief assumes that the Medicaid program is another way of saying "New Mexico Human Services Department." In conjunction with this argument, Presbyterian contends that nowhere do Plaintiffs cite case law standing for the proposition that when a statute imposes a non-delegable duty on a government agency, any implied right of action by the aggrieved party against that agency includes a right to sue other entities with which the agency has a contractual or regulatory relationship.

**{32}** These arguments are misplaced. We agree with the district court's holding that the MCOs "are not [health plans], and they are not third[-]party insurers. Rather, they are part of the Medicaid program." The Medicaid program begins at the government level, upstream of the MCOs, and continues through the provision of care and services to recipients downstream of the MCOs. Had our Legislature intended reimbursements to come directly and only from HSD, it could have easily used the term "department" in Section 27-2-16(B). *See* § 27-2-2(A) (defining "department" as the "[H]uman [S]ervices [D]epartment"). Rather, the Legislature chose a broader term, "Medicaid program," which we interpret to encompass the entire Medicaid apparatus by which patients are served by Medicaid funds through HSD's agents. In other words, the statute tells pharmacists that, under a certain set of circumstances by legislative enactment, the money appropriated by the state and federal government and passed through several layers of bureaucracy, agents, and contractors will be paid to them in a predetermined manner on which they may rely. This is true regardless of whether the program operates under fee-for-service, managed care, or some other method. Under managed care, the MCOs were contracted by HSD to be the conduits for Medicaid funds, succeeding HSD itself. We hold that the statute applies to the MCOs and the managed care program regardless of additional layers of bureaucracy and administrative control.

## 2.   Section 27-2-16(B) Creates a Private Right of Enforcement

**{33}**   Plaintiffs contend that the district court erred in finding that there was no implied private cause of action under Section 27-2-16(B).[5]   When a party seeks to enforce a statute that provides no express mechanism for its enforcement, we examine whether a cause of action may be implied through the common law based on an interpretation of legislative intent or public policy. *Nat'l Trust for Historic Pres. v. City of Albuquerque*, 117 N.M. 590, 594, 874 P.2d 798, 802 (Ct. App. 1994); *see Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶¶ 9-10, 135 N.M. 397, 89 P.3d 69 (holding that legislative intent and public policy supported the conclusion that third parties may bring a cause of action against insurers for unfair practices where the statute at issue provided a cause of action generally). "[A] state court, because it possesses common-law authority, has significantly greater power than a federal court to recognize a cause of action not explicitly expressed in a statute." *Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801.   In determining whether to recognize whether there is a cause of action, we examine three non-exclusive factors:  "(1) Was the statute enacted for the special benefit of a class of which the plaintiff is a member?[;] (2) Is there any indication of legislative intent, explicit or implicit, to create or deny a private remedy?[;] and (3) Would a private remedy either frustrate or assist the underlying purpose of the legislative scheme?" *Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801.   In addition, "[a] state's public policy, independent of [these] factors, may be determinative in deciding whether to recognize a cause of action." *Id.* at 594, 874 P.2d at 802.

### a.   Implied Cause of Action Based Upon Legislative Intent

**{34}**   First, we address the three factors that may contribute to the recognition of a private cause of action based upon legislative intent.   We first analyze whether the statute was enacted for the special benefit of a class of which Plaintiffs are members.   Section 27-2-16(B) states that, "[i]f drug product selection is permitted . . . , reimbursement by the [M]edicaid program shall be limited to the wholesale cost of the lesser expensive[,] therapeutic equivalent drug generally available in New Mexico plus a reasonable dispensing fee of at least three dollars sixty-five cents ($3.65)." Section 27-2-16(B) benefits individuals or entities that dispense drugs to Medicaid participants, ensuring that each receives a reasonable dispensing fee and payment for the drug dispensed. Plaintiffs, being pharmacists, clearly fall within a class sought to be benefitted by the statute.

**{35}**   Next, we examine whether there is any indication in the statute of legislative intent, explicit or implicit, to create or deny a private remedy.   "The guiding principle of statutory

---

[5]We distinguish the present appeal from a previous appeal in this same case regarding Plaintiffs' attempt to bring a § 1983 suit for HSD's supposed violation of Section 27-2-16(B).   In *Starko II*, we held that Plaintiffs could not bring a § 1983 claim for a procedural due process violation with regard to Section 27-2-16(B). *Starko II*, 2006-NMCA-085, ¶ 29. This previous appeal determined "only the discrete question of whether Plaintiffs may proceed against Defendants under § 1983[] and not whether Plaintiffs can proceed against HSD under other state law remedies." *Starko II*, 2006-NMCA-085, ¶ 29.

construction is that a statute should be interpreted in a manner consistent with legislative intent. . . . [W]e look not only to the language used in the statute, but also to the purpose to be achieved and the wrong to be remedied." *Hovet*, 2004-NMSC-010, ¶ 10. Here, we utilize factors developed by the United States Supreme Court in evaluating legislative intent, including (1) whether the statute contains "rights-creating language"; (2) whether it has an "aggregate, not individual, focus"; and (3) the purpose of the statute. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002); *see Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997)*; Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801. The Supreme Court typically applies these questions regarding legislative intent within the context of a § 1983 action. However, this particular legislative intent inquiry is the same in our context because, in both situations, a court has the task of analyzing whether the Legislature intended to create or deny a private remedy.

**{36}**     In *Gonzaga University*, the Supreme Court held that the Family Educational Rights and Privacy Act's (FERPA) non-disclosure provisions failed to confer enforceable rights as the provisions "entirely lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." 536 U.S. at 287. There, a student sought to sue the university by bringing a § 1983 action for violating non-disclosure provisions of FERPA that prohibited federal funding of educational institutions that had a policy or practice of releasing education records to unauthorized persons. *Gonzaga Univ.*, 536 U.S. at 276-77. The Supreme Court concluded that the provisions were only addressed to the Secretary of Education to direct the expenditure of funds and that the statute did not address "the interests of individual students and parents." *Id* at 287. The Supreme Court also determined that "FERPA's non[-]disclosure provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. Therefore, . . . they have an 'aggregate' focus, they are not concerned with whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights[.]" *Id.* at 288 (internal quotation marks and citations omitted). Thus, the *Gonzaga University* Court held that the student did not have a private cause of action under FERPA. *Id*. at 290.

**{37}**     In contrast, the United States Supreme Court held that there was legislative intent to create a private cause of action under the Boren Amendment. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 512 (1990). There, an association of hospitals brought a § 1983 action, challenging the administration of the state's Medicaid program on the ground that it violated the Boren Amendment. *Wilder*, 496 U.S. at 501-02. The Boren Amendment required states to reimburse Medicaid providers in an amount that was "reasonable and adequate" to meet the costs "incurred by efficiently and economically operated facilities[.]" *Id*. (internal quotation marks and citation omitted). The Supreme Court concluded that the Boren Amendment created a substantive right for health care providers in reasonable and adequate reimbursement rates. *Id.* at 509-10. The Supreme Court explained:

> There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system for reimbursement of providers and is phrased in terms benefit[t]ing health care providers:  It requires a state plan to provide for payment . . . of the

> hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan.

*Id.* at 510 (internal quotation marks and citation omitted). The Supreme Court concluded that this right was enforceable because the Boren Amendment was cast in mandatory, rather than precatory, terms since it required the state to "provide for payment . . . of hospital[s] according to rates the [s]tate finds are reasonable and adequate." *Id.* at 512 (first alteration in original). The Court described this language as a "congressional command, . . . wholly uncharacteristic of a mere suggestion or nudge" and held that the hospital association had a right to bring the action. *Id.* (internal quotation marks and citation omitted).

{38}    The case at bar more resembles *Wilder* rather than *Gonzaga University*, and the facts here, as in *Wilder*, weigh in favor of finding legislative intent to create a private cause of action under Section 27-2-16(B). The present case and *Wilder* deal with mandatory reasonable reimbursement of Medicaid providers. Like the statute in *Wilder*, Section 27-2-16(B)'s language is mandatory, stating that "[i]f drug product selection is permitted by Section 26-3-3 . . . , reimbursement by the [M]edicaid program shall be limited to the wholesale cost of the lesser expensive[,] therapeutic equivalent drug generally available in New Mexico plus a reasonable dispensing fee of at least three dollars sixty-five cents ($3.65)." We have stated in the past that "[t]he word 'shall' as used in a statute is generally construed to be mandatory." *State v. Guerra*, 2001-NMCA-031, ¶ 14, 130 N.M. 302, 24 P.3d 334. Thus, in the present case, reimbursement for filling prescriptions as intended by the Legislature in accordance with the statute is a mandatory legislative "command" very similar to that in *Wilder*. Plainly, the Legislature intended pharmacists to fill prescriptions in a certain way under Section 26-3-3 and be paid in a certain way for doing so under Section 27-2-16(B). This certainty reinforces our conclusion.

{39}    Furthermore, Section 27-2-16(B) contains rights-creating language that gives Plaintiffs a protected property right in the reasonable dispensing fee and average wholesale price (AWP) of the lesser-expensive, therapeutic equivalent drug when Plaintiffs can dispense a drug within this category to a Medicaid patient. "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972); *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property, the [Supreme] Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except for cause." (internal quotation marks and citation omitted)). "The definition of property centers on the concept of entitlement; therefore, interests in government benefits will be recognized as constitutional property if the person can be deemed entitled to them." *Bd. of Educ. of Carlsbad Mun. Sch. v. Harrell*, 118 N.M. 470, 477, 882 P.2d 511, 518 (1994) (internal quotation marks and citation omitted). Section 27-2-16(B) entitles Plaintiffs to a specific monetary payment for drugs already dispensed. We suggested in response to a previous appeal from this case that "Section 27-2-16(B) confers upon pharmacists a protected property interest in a dispensing fee of $3.65, particularly where they have already filled prescriptions and are awaiting reimbursement." *Starko II*, 2006-NMCA-085, ¶ 19. We now

abandon previous assumptions and suggestions to decide that this is true. Unlike the statute in *Gonzaga University*, Section 27-2-16(B) specifies the particular right attributable to Plaintiffs, an amount of money that is clearly defined within the statute and a direction from the Legislature that it be paid. This legislative command is not just an institutional policy and practice.

**{40}** Like *Wilder*, the payment provision of Section 27-2-16(B) speaks directly to the "Medicaid program," ordering it to pay the plaintiffs a specific fee for dispensing drugs to Medicaid recipients. Section 27-2-16(B) is pointedly concerned with whether the needs of this particular group have been satisfied, giving each pharmacist dispensing drugs to Medicaid patients an individual right to a particular amount of reimbursement. Thus, the purpose of Section 27-2-16(B) is directed to the reimbursement of individual providers, and the wrong to be remedied by the statute is the insufficient reimbursement of individual Medicaid providers. The provisions speak not only to the expenditure of funds but, more specifically, guarantee a property right in the dispensing fee and cost of the drug to dispensing pharmacists. Therefore, there is implicit legislative intent to create an enforceable right for Medicaid providers, like Plaintiffs, through Section 27-2-16(B).

**{41}** Last, we determine whether a private remedy would either frustrate or assist the underlying purpose of the legislative scheme. The purpose of Section 27-2-16(B) is to set a reasonable rate of reimbursement for Medicaid providers as part of a larger legislative scheme dealing with the administration of Medicaid in New Mexico. This statute requires the appropriate reimbursement of Medicaid providers and also confers a protected property right. Unlike other statutes[6] within this legislative scheme dealing with payments to providers, the Legislature never repealed or exempted the MCOs from Section 27-2-16(B) following the Medicaid program's transition into managed care. Thus, we conclude that providing a private remedy would assist and further the underlying purpose of the legislative scheme.

**{42}** For the reasons we have discussed, we hold that the Legislature intended to provide an implied cause of action under the statute.

**b.** **Application of the Private Cause of Action to the Parties**

**{43}** As explained above, Section 27-2-16(B) creates an implied private cause of action. Plaintiffs may seek their remedy directly from the MCOs because the MCOs are part and parcel with the Medicaid program and a conduit for all of the state's Medicaid managed care funding.

**{44}** In addition, Plaintiffs argue on appeal that "the district court erred in concluding that [Section] 27-2-16(B) [did] not create a private right of action against [HSD]." Yet, the district court never made a ruling in its memorandum opinion on the issue of whether HSD

---

[6]The Legislature exempted the managed care system from the equal pay provision affecting physicians, dentists, optometrists, podiatrists, and psychologists. § 27-2-12.3.

can be subject to the private cause of action derived from Section 27-2-16(B). After reviewing Plaintiffs' motion for summary judgment on the pleadings as to HSD, we are unable to locate any argument regarding an implied cause of action against HSD. Moreover, Plaintiffs fail to provide citation to an argument in the motions regarding the implied cause of action. Instead, they argue that the issue was preserved because "the district court explicitly relied on its prior rulings [that Section 27-2-16(B) did not create a private cause of action] in granting [HSD]'s motions for summary judgment." We are unpersuaded by this argument, especially because Plaintiffs even failed to assert an implied cause of action against HSD in their fourth amended complaint. Within Count Two of the fourth amended complaint, Plaintiffs raise state law violations, specifically the violation of Section 27-2-16(B). There, Plaintiffs state that "[t]he MCOs have violated [Section] 27-2-16(B). . . . The actions of the MCOs in failing to comply with state law were done intentionally and in a reckless and willful disregard of the rights of Plaintiffs for which they are entitled to punitive damages." Not once is HSD mentioned in Count Two as a party violating the statute, nor is an implied cause of action against HSD discussed elsewhere in the complaint.

**{45}** For the above reasons, we hold that the issue of an implied cause of action against HSD has not been preserved. *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987) ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court."); *see State v. Wyman*, 2008-NMCA-113, ¶ 10, 144 N.M. 701, 191 P.3d 559. We will not address issues that were not preserved and are now raised for the first time on appeal. *State v. Ware*, 118 N.M. 703, 705, 884 P.2d 1182, 1184 (Ct. App. 1994). Thus, upon remand, the implied cause of action under Section 27-2-16(B) may be tried against the MCOs because such arguments were preserved, but not against HSD.

### 3. Section 27-2-16(B) Applies Whenever a Substitution is Possible, Even if the Substitution Was Not Made

**{46}** Plaintiffs also appeal the district court's holding that the statute "applies whenever a pharmacist dispenses a multiple source drug to a Medicaid recipient at a lower cost than the drug listed in the prescription; and . . . whenever a pharmacist dispenses a therapeutically equivalent drug to a Medicaid recipient which is lower in cost than the drug listed in the prescription." This issue was briefed and preserved by Plaintiffs in the second of the two appeals at issue in this Opinion to which HSD was a party. Though the MCOs have not briefed the matter, it was properly raised, and we consider our resolution of this legal issue applicable to all of the parties.

**{47}** Plaintiffs contend that based upon its plain language, Section 27-2-16(B) should apply "anytime a pharmacist is *permitted* to select among multiple source drug[s] or therapeutically equivalent drugs in providing a prescription to a Medicaid recipient." We agree with Plaintiffs that the plain language requires that the dispensing fee apply whenever a substitution of a lesser expensive, therapeutic equivalent drug can be made, not only when it is actually made. In analyzing how to apply Section 27-2-16(B), we give effect to the statute's clear and unambiguous language. *Smith*, 2009-NMCA-028, ¶ 8. We will not read into a statute "language which is not there, especially when it makes sense as it is written."

*Reule Sun Corp. v. Valles*, 2010-NMSC-004, ¶ 15, 147 N.M. 512, 226 P.3d 611 (internal quotation marks and citation omitted). In addition, "the practical implications, as well as the statute's object and purpose are considered." *Id.*

**{48}** Before we begin our analysis, we reiterate that Section 27-2-16(B) states that "[i]f drug product selection is permitted by Section 26-3-3 . . . , reimbursement by the [M]edicaid program shall be limited to the wholesale cost of the lesser expensive[,] therapeutic equivalent drug generally available in New Mexico plus a reasonable dispensing fee of at least three dollars sixty-five cents ($3.65)." Section 27-2-16(B). As explained previously, reimbursement according to this statute is mandatory because of the Legislature's use of "shall." We now address when and how Section 27-2-16(B) would be applicable.

**{49}** The crucial phrase of the statute is "[i]f drug product selection is *permitted* by Section 26-3-3." Section 27-2-16(B) (emphasis added). Here, the plain language conditions the applicability of the statute on whether drug product selection is allowed. This precondition must be fulfilled before the Medicaid program is required to pay the reasonable dispensing fee and AWP of the lesser expensive drug. The statute specifies that it applies when the substitution is "permitted" and does not require the substitution to actually occur. If the Legislature wanted to condition the applicability of this payment scheme on the dispensing of the lesser expensive, therapeutic equivalent drug, it would have included those terms within the statute.

**{50}** Furthermore, this reading of the statute is consistent with the practical implications, objective, and purpose of Section 27-2-16(B). As HSD asserts, "[t]he Legislature intended this section to save money to the purchaser of prescription drugs regardless of whether the purchaser is an individual or the Medicaid program." This statute seems to proceed from the federal mandate that New Mexico's Medicaid system should spend its money as wisely as possible. Thus, when a lesser expensive, therapeutic equivalent drug is available, the government should not pay for a more expensive one. The program seeks to save money by limiting reimbursement to the wholesale cost of the lesser expensive drug, while paying pharmacists a predetermined "reasonable dispensing fee." Section 27-2-16(B). This reading promotes consistency and predictability. It also gives an incentive to pharmacists to save the Medicaid program money by refusing to dispense name brand drugs when lesser expensive, therapeutic equivalent drugs are available. Our reading also comports best with the statute's title, "Compliance with federal law[,]" by ensuring that payments to Medicaid pharmacists are "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available." 42 U.S.C. § 1396a(a)(30)(A).

**{51}** In contrast, the district court's interpretation of Section 27-2-16(B) limits the statute's application to those instances when there is actual proof that the drug dispensed differed from the original prescription. HSD supports the district court's conclusion with an argument based upon Section 26-3-3, which provides the circumstances under which a prescription can be filled with a lesser expensive, therapeutic equivalent drug. HSD argues that the district court's interpretation is correct because "[t]hat is precisely what [Section] 26-3-3 requires[.]" HSD goes on to discuss the requirements of Section 26-3-3,

not just the types of permissible substitution, but also what a pharmacist must do when dispensing the lesser expensive, therapeutic equivalent drug under Subsection (D) of Section 26-3-3. HSD contends that because "[t]he Legislature required that the proof of product selection appear on the label of the drug dispensed [under Subsection D]," there must be proof that the substitution occurred for Section 27-2-16(B) to apply.

**{52}**     HSD places too much emphasis on the role of Section 26-3-3 in interpreting Section 27-2-16(B), essentially contending that every aspect of Section 26-3-3 must be fulfilled and a lesser expensive, therapeutic equivalent drug issued in accordance with it for Section 27-2-16(B) to apply. This is not the case. Section 27-2-16(B) only requires that "drug product selection [be] permitted by Section 26-3-3" for the statute to apply. Section 26-3-3(A) and (B) set forth the two instances where a pharmacist may dispense a lesser expensive, therapeutic equivalent drug: (1) when "the drug[] . . . satisfies the final determinations so recognized and listed by the [F]ederal [D]epartment of [H]ealth and [H]uman [S]ervices" and (2) when the "drug . . . appears on the [F]ederal [F]ood and [D]rug [A]dministration's approved prescription drug products with therapeutic equivalence evaluation list as supplemented[.]" Section 26-3-3(C) explicitly states that "[d]rug product selection shall be permitted only under circumstances and conditions set forth in Subsections A and B of this section[.]" Therefore, if the prescribed drug falls under one of the two categories stated in Section 26-3-3(A) and (B), then the drug product selection is permissible and the pharmacists must be reimbursed with the AWP of the equivalent drug plus a reasonable dispensing fee. Whether the drug label includes the fact that a substitution has occurred is not relevant to the criteria for determining whether a substitution is permissible.

**{53}**     Furthermore, Plaintiffs assert that "the district court's decision does not adequately take into account that drug product selection occurs not only in the case of brand[]name/generic substitution, but also in the case of choosing among non-pioneer versions of multiple source drugs." Plaintiffs contend that there are three reasons for which this distinction must be accounted, all of which are related to the FDA distinguishing between multiple source drugs as separate and unique drugs with or without the same active ingredients. We do not see that the district court ruled that Section 27-2-16(B) only applied when generic drugs were substituted for brand name drugs. As stated above, the district court held that the statute "applies whenever a pharmacist dispenses a multiple source drug to a Medicaid recipient at a lower cost than the drug listed in the prescription; and . . . whenever a pharmacist dispenses a [therapeutic] equivalent drug to a Medicaid recipient which is lower in cost than the drug listed in the prescription."

**{54}**     The district court appears to draw no distinction between substitutions where the prescribed drug is a brand name drug and substitutions where the prescribed drug is a multiple source generic version. Based upon the plain language of the statute, we hold that the statute requires no distinction between prescribed drugs that are generic and those that are brand name, as long as the pharmacist is authorized to use his or her discretion to dispense a lesser expensive drug than the prescribed drug, and the substitution meets the requirements set out in Section 26-3-3(A) and (B).

**{55}** Thus, we reverse the district court's determination that Section 27-2-16(B) applies only when a substitution actually occurs. Moreover, Section 27-2-16(B) applies to both brand name and generic prescribed drugs, so long as a substitution of a lesser expensive, therapeutic equivalent drug would be permissible. We therefore hold that Section 27-2-16(B) applies whenever a pharmacist may use his or her discretion to issue a lesser expensive drug that is the therapeutic equivalent to the prescribed drug even if that substitution does not occur.

4.     **Amount of Payment Required by Section 27-2-16(B)—The District Court Failed to Determine Whether $3.65 Was a Reasonable Dispensing Fee**

**{56}** Plaintiffs appeal the district court's finding that a base dispensing fee of $3.65 is reasonable, arguing that there are contested issues of material fact with regard to the reasonableness of the dispensing fee. Reasonableness is a question of fact when the court is required to weigh evidence. *Rio Grande Kennel Club v. City of Albuquerque*, 2008-NMCA-093, ¶ 18, 144 N.M. 636, 190 P.3d 1131 ("The issue regarding the reasonableness of [a statute's license and permit] fees presented a question of fact requiring the district court to weigh evidence. . . . Facts may exist to prove that the fee provisions in [the statute] are excessive or unreasonable with respect to the cost of regulation.").

**{57}** In granting HSD's motion for summary judgment, the district court based its holding that $3.65 was a reasonable dispensing fee on two grounds. First, it gave deference to HSD's interpretation of Section 27-2-16(B). Second, the court stated that Plaintiffs did not provide the court with "any information that would cast doubt on [HSD's] assertion . . . that the amount New Mexico pays its providers is higher than that paid by private insurers in the private sector [to pharmacists] in New Mexico."

**{58}** Plaintiffs contend that they presented evidence below that created a dispute regarding the reasonableness of the $3.65 dispensing fee, a material fact. First, Plaintiffs argue that the numerous studies they presented about dispensing costs demonstrated that those costs exceeded $3.65. Second, Plaintiffs assert that the reasonableness of the $3.65 fee is questionable because there is evidence that HSD paid Medicaid pharmacists a dispensing fee of $4.00 between 1991 and 2002. Third, Plaintiffs contend that the reasonableness of the dispensing fee is put into question by the former Director of the Medical Assistance Division's admission that the $3.65 dispensing fee was well below the average pharmacy's dispensing cost. We agree with Plaintiffs and conclude that this information bears on the reasonableness of the fee as it would inform and influence the fact finder's decision.

**{59}** Further, HSD directs this Court to other information that raises additional factual questions regarding the reasonableness of a $3.65 dispensing fee. HSD asserts that "the actual cost to dispense prescription drugs varies dramatically with the volume of the dispensing pharmacy. . . . [Some smaller pharmacies] count[] out pills by hand[,] while large pharmacies have machines that can do it faster [and] have non-pharmacist technicians to fill prescriptions who get paid less than a licensed pharmacist." Thus, a base fee of $3.65 may be reasonable for larger pharmacies, where it may not be reasonable for smaller pharmacies.

**{60}** Moreover, HSD's contention that the $3.65 dispensing fee is greater than that paid in the private health insurance sector is not determinative of reasonableness itself and raises further factual questions. We do not know how the private sector reimburses pharmacists for the ingredient cost of the drug, or whether they reimburse for more or less than the AWP, minus fourteen percent, as the Medicaid program does. HSD even admits in its reply brief regarding this motion for summary judgment that dispensing fees can vary greatly, depending upon how much the pharmacists are reimbursed for the drug ingredient costs. In that brief, HSD argued that "New Mexico's dispensing fee is reasonable when compared with the fees paid under Medicaid by other [s]tates. . . . Other [s]tates pay a dispensing fee ranging from $2.00 to more than $10." HSD then explained that "some [s]tates with a higher dispensing fee pay a lower ingredient cost." Thus, the standard insurance companies use to reimburse for the ingredient cost plays a significant role in how much the companies will then reimburse for the dispensing fee. We are not provided with information regarding how the private sector reimburses pharmacists for the ingredient cost. Without such information, we will not assume that the private sector's ingredient cost reimbursement schemes are similar to Medicaid's.

**{61}** Because the district court was required to weigh the evidence regarding this issue, we hold that reasonableness of the dispensing fee was a question of fact in this case. Facts exist in the record that may prove that the $3.65 fee was unreasonable. Thus, summary judgment on the reasonableness of the dispensing fee was inappropriate. We remand for a factual determination about what a reasonable dispensing fee is for each pharmacy.

**C. The District Court Properly Dismissed Plaintiffs' Claim Regarding HSD's Reduction of Reimbursement Without Federal Approval During a Six-Month Gap Period**

**{62}** Plaintiffs argue that the district court erred in denying their motion for summary judgment on HSD's violation of Section 27-2-16(B) for failure to reimburse Plaintiffs in accordance with Medicaid legislation for the drug ingredient costs. From January 1, 1991 through June 30, 1997, HSD reimbursed fee-for-service Medicaid pharmacy providers for drug ingredient costs at the rate of the AWP, minus ten and one-half percent. HSD's regulations were amended, effective and implemented on June 30, 1997, reducing the ingredient cost to the AWP, minus twelve and one-half percent. Federal approval of the reduction was given by the Federal Health Care Financing Agency in April 1998, retroactive to January 1, 1998. Plaintiffs contend they are owed $960,000 by HSD due to the reduction during the six-month gap between when the reduction was implemented by HSD (July 1, 1997) and when federal approval was given (January 1, 1998).

**{63}** Although all parties agree that approval is necessary, they disagree about whether approval can be retroactive. Plaintiffs contend that "they are entitled to this amount because Defendants did not have approval for the rate change when they began to reimburse at the new amount." HSD argues that retroactive approval is sufficient. The district court held that HSD was not liable for implementing an amendment to the state Medicaid program prior to approval by the federal government. We affirm the district court's ruling and hold that retroactive approval is sufficient.

**{64}** Two federal statutes of the Social Security Act provide guidance in this matter. Under Title XIX of the Social Security Act, 42 U.S.C.A. § 1396-1 (1984), "[t]he sums made available under [Medicaid legislation] shall be used for making payments to [s]tates which have submitted, and had approved by the Secretary [of the Federal Department of Health and Human Services], [s]tate plans for medical assistance." Furthermore, under 42 U.S.C.A. § 1396c (1965),

> [i]f the Secretary, after reasonable notice and opportunity for hearing to the [s]tate agency administering or supervising the administration of the [s]tate plan approved under this subchapter, finds--
>
> > (1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or
> >
> > (2) that in the administration of the plan there is a failure to comply substantially with any such provision;
>
> the Secretary shall notify such [s]tate agency that further payments will not be made to the [s]tate (or, in his discretion, that payments will be limited to categories under or parts of the [s]tate plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such [s]tate (or shall limit payments to categories under or parts of the [s]tate plan not affected by such failure).

**{65}** The statutes quoted above are the current versions of the Act. Prior to 1981, the Act contained different language that required preapproval of state plans before they were implemented. Specifically, 42 U.S.C. § 1396a(a)(13)(D) (1980) required that the state Medicaid program provide "for payment of the reasonable cost of inpatient hospital services provided under the plan, as determined in accordance with methods and standards . . . which shall be developed by the state and reviewed and approved by the Secretary, and (after notice of approval by the Secretary) included in the plan[.]" *Magee-Womens Hosp. v. Heckler*, 562 F. Supp. 483, 485 (W.D. Pa. 1983) (citing 42 U.S.C. § 1396a(a)(13)(D) (internal quotation marks omitted)). This previous version of the Act required that the state obtain notice of approval from the Secretary before the changes were included in the state's Medicaid program. The amended statutes in place today do not facially require prior approval. The absence of such language in the amended version of Title XIX is compelling evidence that Congress intended to abandon the requirement of prior approval.

**{66}** Furthermore, as the district court highlighted in its memorandum opinion, persuasive case law supports this position. In *Charleston Mem'l Hosp. v. Conrad*, 693 F.2d 324, 325-26 (4th Cir. 1982), the plaintiff argued that the state illegally implemented reductions in Medicaid coverage because implementation took place before the federal government approved the changes. After analyzing 42 U.S.C. § 1396 (1974), the court held for the defendants, stating that the Act does not require prior approval. The court reasoned that "[t]he Act does not expressly provide that a plan may not be modified without prior approval

by the Secretary. Congress easily could have given the Secretary such approval authority. Instead, the Secretary is authorized only to impose sanctions when modifications do not comport with the Act." *Charleston Mem'l. Hosp.*, 693 F.2d at 332-33. Similarly, in *Jennings v. Alexander*, 518 F. Supp. 877 (M.D. Tenn. 1981), Medicaid recipients sued to enjoin the state's reduction of funding for inpatient hospital care. In addressing the plaintiffs' argument that the reduction was invalid without prior approval of the Secretary, the court held that prior approval was unnecessary. *Id*. at 888. "Such a requirement [of prior approval] would effectively hamstring the ability of state administrators to respond to changing demands on the Medicaid program or to respond to fiscal crises such as the one currently facing the [s]tate." *Id*. The *Jennings* court also reasoned that the prior approval requirement would be inconsistent with 42 U.S.C. § 1396c, which, as explained above, requires the Secretary to review state Medicaid programs and changes to such plans and to cut off federal payments to the state when its plan fails to comply with federal law. *Jennings*, 518 F. Supp. at 888; *see Ill. Council on Long Term Care v. Miller*, 579 F. Supp. 1140, 1147 (N.D. Ill. 1983) ("This court holds . . . that implementation of the state's amendment to its reimbursement plan before acceptance by the Secretary was not in violation of federal law."). We agree with the above holdings. Statutory construction of the Act reveals that preapproval is not required, and such a requirement would weaken New Mexico's ability to react to fiscal exigencies.

**{67}**     Plaintiffs cite two cases in support of their appeal of this issue: *AMISUB (PSL), Inc. v. Colorado Dep't. of Soc. Servs.*, 879 F.2d 789 (10th Cir. 1989) and *Oregon Ass'n. of Homes for Aging, Inc. v. Oregon*, 5 F.3d 1239 (9th Cir. 1993). In *AMISUB*, the court held that when the state amended its Medicaid inpatient reimbursement rates, such an amendment was void because it violated procedural and substantive requirements of the Federal Medicaid Act. 879 F.2d at 801. However, the violations at issue had nothing to do with implementing reimbursement rates without prior authorization. *Id*. Likewise, *Oregon Ass'n.* does not deal with an amended plan submitted for HCFA approval. 5 F.3d at 1241. There, nursing homes challenged the state's reclassification of nursing services into rate categories, causing the nursing homes to receive less reimbursement from the Medicaid program. *Id*. at 1240. The court found that "[a] law that effects a change in payment methods or standards without HCFA approval is invalid." *Id*. at 1241. Nonetheless, the state in that case never submitted an amendment to HCFA for approval even after the reclassification of nursing services was implemented. Because neither of these cases deals with the issue of implementing changes in reimbursement prior to HCFA approval, we do not find them persuasive.

**{68}**     We agree with the district court that "[t]he cases cited by Defendants [in their motion], the fact that prior approval would hamstring [s]tate officials trying to anticipate . . . and react to changing demands on the Medicaid program, as well as the history of the statute[,] make a strong case against prior approval." Thus, we affirm the district court's holding that Plaintiffs do not have a cause of action against HSD for reimbursement during the period the amendment to the Medicaid payment structure was not yet approved.

**D.      Plaintiffs May Bring a Breach of Contract Claim Against HSD Under the Provider Agreements**

**{69}**     Before the Medicaid program in New Mexico transitioned to managed care, Plaintiffs signed provider agreements with HSD "in order to qualify for reimbursement from the Medicaid program." Through the agreements, HSD required providers to agree to terms regarding record keeping, payment, compliance with state and federal law, reimbursement by third parties, and other issues. Plaintiffs argue that the district court improperly held that no obligation could arise from Plaintiffs' provider contracts that incorporate the guarantees of Section 27-2-16(B). Plaintiffs contend that the provider "agreements expressly and impliedly require [HSD] to pay any shortfall in pharmacist reimbursement and create an actionable claim against [HSD] for the shortfall between what the MCOs paid and what [Section] 27-2-16(B) requires." Plaintiffs make two specific arguments regarding a third-party liability clause in the contract and the incorporation of Section 27-2-16(B) into the contracts.

**{70}**     First, Plaintiffs argue that the third-party liability provisions of the provider agreements require HSD to make up any shortfall arising out of the MCOs' failure to abide by Section 27-2-16(B). The 1990 provider agreements contain a section called "Third[-]Party Liability" that requires Plaintiffs to seek payment from third-party insurers prior to seeking payment from the Medicaid program. The section further states that "[t]he provider understands that in those instances where the provider receives payment from a liable third party for a Medicaid covered service, the Medicaid agency can pay only to the extent that the Medicaid allowed amount exceeds the amount paid by the third party." Plaintiffs contend that the MCOs are third-party insurers or health plans, and since the MCOs have failed to pay the proper dispensing fee, "[HSD] is responsible for the difference."

**{71}**     We reiterate here, applying the same reasoning as we did above, that the MCOs are part of the Medicaid program. They are not third-party insurers or health plans when they pay providers for the services and drugs provided to Medicaid participants. In this context, they are conduits for Medicaid funds. Thus, we hold that Plaintiffs' contention that HSD is responsible for the difference under the "Third[-]Party Liability" section of the provider agreements lacks merit. Thus, the district court properly dismissed the contract claim on this ground.

**{72}**     Second, Plaintiffs argue that the provider agreements incorporate Section 27-2-16(B) because all relevant statutes are incorporated into contracts. Plaintiffs argue that, under this agreement, HSD should have ensured that Plaintiffs were paid in accordance with Section 27-2-16(B) and, by failing to do so, they breached the provider contracts.

**{73}**     "A contract incorporates the relevant law, whether or not it is referred to in the agreement." *State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 130, 812 P.2d 777, 784 (1991); *Durham v. Sw. Developers Joint Venture,* 2000-NMCA-010, ¶ 18, 128 N.M. 648, 996 P.2d 911 ("The provisions of applicable statutes are part of every contractual commitment."). We agree that the provider agreements incorporated Section 27-2-16(B) as the statute is relevant and applicable to the contractual commitments involved in the provider agreements, namely, Plaintiffs' commitment to provide services and HSD's commitment to reimburse Plaintiffs. Moreover, the provider agreements specifically reference New Mexico's Medicaid payment structure in the section titled "Payment in Full," stating that the

providers agree to "accept as payment in full the amounts paid in accordance with the reimbursement structure in effect for the period during which such services were provided as per 42 C.F.R. 447.15." There is no doubt that Section 27-2-16(B), as an integral part of the state's Medicaid payment structure for pharmacists, was incorporated into the contracts. Thus, Section 27-2-16(B)'s requirement that pharmacists be reimbursed with the AWP, plus a reasonable dispensing fee when the pharmacist dispenses a lesser expensive, therapeutic equivalent drug, is a term of the provider agreements with which HSD must abide.

{74}    HSD argues that Plaintiffs do not have a right to sue for further reimbursement under this contract because of the above quoted section in the agreements titled, "Payment in Full." HSD contends that this term of the contract waives any right to sue for further reimbursement because Plaintiffs promised to "accept as payment in full the amounts paid in accordance with the reimbursement structure in effect for the period during which such services were provided as per 42 C.F.R. 447.15." HSD argues that, under 42 C.F.R. 447.15, the Medicaid program must be "limited to providers who agree to accept as payment in full the amounts paid by the agency." HSD construes this to mean that providers may not seek further reimbursement or additional payments from the state even when HSD fails to pay providers for their services with the amount required by state statute.

{75}    This is not the meaning of this clause of the contract. If it were, HSD could pay providers nominal fees for their services, and the providers would have no recourse. Plaintiffs entered into the provider agreements, agreeing to accept as payment in full "amounts paid in accordance with the reimbursement structure in effect." They did not agree to accept amounts less than that provided by statute as payment in full. If Plaintiffs were paid in accordance with the reimbursement structure in effect—Section 27-2-16(B)—we would agree that they could not sue under this contract. As Plaintiffs contend that they were paid less than the minimum $3.65 dispensing fee for Section 27-2-16(B)'s applicable prescriptions, we conclude that Plaintiffs have a right to sue for the deficiency.

{76}    HSD further argues the MMCS agreements between HSD and the MCOs included a provision that exempts the state from liability for shortfalls in payments made by the MCOs to Plaintiffs. This provision states that "[t]he subcontractor must accept payment from the MCO as payment for any services included in the benefit package, and cannot request payment from HSD or from Medicaid members . . . for services performed under the subcontract." HSD argues that "[t]his provision was to be incorporated in all contracts between the MCOs and their subcontractors. . . . Thus, [Plaintiffs] have independently contracted away any claim they might have for additional reimbursement by HSD." We disagree with HSD's waiver argument. Pursuant to the district court's order requiring HSD to agree that Plaintiffs did not waive their rights by agreeing to participate in managed care, Plaintiffs have not waived their rights under provider agreements by contracting to participate and participating in managed care.

{77}    Last, HSD opposes Plaintiffs' argument on the ground that Plaintiffs admitted in their fourth amended complaint that the provider agreements only apply to fee-for-service transactions and not to managed care. The paragraph HSD references in Plaintiffs' fourth amended complaint states that "HSD has entered into contracts with . . . Plaintiffs and the

Class for the provision of Medicaid pharmaceutical services on behalf of . . . HSD in the fee-for-service portion of the Medicaid [p]rogram that HSD administers." We do not see how this historical explanation of the provider agreements' purpose amounts to an admission that the contracts only apply to fee-for-service Medicaid reimbursements. The provider agreements were signed during the period in which HSD only reimbursed providers in accordance with the fee-for-service reimbursement plan, prior to the implementation of managed care. Such information was relevant to their complaint. Furthermore, the provider agreements explicitly state that assent by providers is a precondition to any reimbursement by the Medicaid program whatsoever. The final clause of the contract states the provider agreements must be signed as "a precondition to participation in the New Mexico Medical Assistance Program . . . that the provision of services, the billing of services, [and] the receiving of payment for services under the program cannot be accomplished without the proper completion and Department approval of [the provider agreement]." Thus, we conclude that these agreements govern Plaintiffs' relationship with HSD with regard to any Medicaid reimbursement. We therefore reject HSD's argument with regard to the admission.

**{78}** In sum, Plaintiffs may bring a breach of contract cause of action against HSD for the Medicaid program's failure to reimburse Plaintiffs in accordance with Section 27-2-16(B). We remand to the district court to determine whether HSD, in its performance under the provider agreements, has "fail[ed] to perform a contractual obligation when that performance is called for." UJI 13-822 NMRA.

### E. Plaintiffs' Contract Claim as Third-Party Beneficiaries

**{79}** Plaintiffs seek to enforce contracts between HSD and the MCOs on a third-party beneficiary theory. As we stated earlier, these contracts specifically incorporate Section 27-2-16(B). The contractual provisions are written in clear language, and there can be no doubt that the MCOs and HSD intended compliance with the statute to form part of their agreement. In their most current form, the contracts provide that subcontracts "for pharmacy providers shall include a payment provision consistent with [Section 27-2-16(B)] unless there is a change in law or regulation." There have been no such changes.

**{80}** Plaintiffs argue that the district court erred when it held that "an action against [the] MCOs on a third-party beneficiary theory would be inconsistent with the [conclusion] that Plaintiffs have no private right of action." HSD argues that Plaintiffs were not intended third-party beneficiaries as they are not referenced in the MMCS agreements and neither HSD nor any MCO intended or believed that the agreements had the purpose of benefitting Plaintiffs. In addition, the MCOs put forward a two-fold parry to HSD's argument that Plaintiffs are not intended third-party beneficiaries. First, they echo the order of the district court, arguing that because no private right of action is available under the statute, any attempt to enforce it through the contract must fail. Second, they argue that any analysis of such a claim must conclude that Plaintiffs were not intended third-party beneficiaries to the contracts between the MCOs and HSD and, therefore, the district court was correct. We consider each argument in turn.

**{81}**    We are unpersuaded by HSD's contention that Plaintiffs were not intended third-party beneficiaries because they were not referenced by name in the contract, and the contention that Defendants did not believe that the purpose of the contract was to benefit Plaintiffs.  "A third-party is a beneficiary if the actual parties to the contract intended to benefit the third-party.  The intent to benefit the third-party must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary." *Callahan v. N.M. Fed'n of Teachers-TVI*, 2006-NMSC-010, ¶ 20, 139 N.M. 201, 131 P.3d 51 (internal quotation marks and citations omitted).  Whether the parties had the requisite intent is a question of fact, appropriate for the trier-of-fact to decide.  *Moriarity v. Meyer*, 21 N.M. 521, 529-30, 157 P. 652, 655 (1916).  The fact that Plaintiffs were not referenced by name in the contract does not prove by itself that the contract was not intended to benefit them.  Section 27-2-16(B), which is incorporated into the contract, specifically references Medicaid providers who dispense drugs to Medicaid participants.  Plaintiffs fall within this class of Medicaid providers and, thus, could be found by a trier-of-fact to be intended third-party beneficiaries on that basis.  Moreover, Defendants' assertions that they did not intend to benefit Plaintiffs, as well as the fact they were not named in the contract, are evidence for the trier-of-fact to consider in determining whether Plaintiffs are intended third-party beneficiaries.

**{82}**    Next, the MCOs' first argument has been disposed of by our analysis above, indicating that there is an implied cause of action under Section 27-2-16(B).  Even if there was not an implied cause of action under that statute, such a fact would not bar their third-party beneficiary claim.  The cases cited by the MCOs and relied upon by the district court generally hold that a third-party beneficiary claim is just another way of getting a certain remedy from a statute that does not provide that remedy.  *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (refusing to consider third-party beneficiary claim where the plaintiffs had not sought relief under the prescribed statutory remedy); *Hodges v. Atchison, Topeka & Santa Fe Ry. Co.*, 728 F.2d 414, 415 (10th Cir. 1984) (disallowing the plaintiff's claim under a third-party beneficiary theory because the plaintiff refused to participate in arbitration as provided by statute and, stating in dicta, that the claim was "but another aspect of the implied right of action argument"); *Carson v. Pierce*, 546 F. Supp. 80, 87 (E.D. Mo. 1982) (reaching the merits of the contract claim, but holding that the plaintiffs were not intended third-party beneficiaries on the basis that the statute created no implied right of action); *Wogan v. Kunze*, 623 S.E.2d 107, 117, 120 (S.C. Ct. App. 2005) (holding that the non-existence of a private remedy under the statute prohibited the third-party beneficiary claim).

**{83}**    Nonetheless, other courts have recognized such claims.  *See Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1330 (N.D. Ga. 2000) (allowing a third-party beneficiary claim despite a lack of Congressional intent to create a private remedy under the Medicare and Medicaid Acts); *Found. Health v. Westside EKG Assocs.*, 944 So. 2d 188, 194-95 (Fla. 2006) (holding that the lack of a private right of action in a state statute did not foreclose the plaintiff's third-party beneficiary claim); *Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 668 (Mo. 1999) (en banc) (allowing a third-party beneficiary claim to enforce the inclusion of a statute in a contract where the statute provided no private cause of action).

{84}     The first approach promoted by the MCOs is founded on the notion that allowing a third-party beneficiary claim is somehow identical to recognizing an implied right of action under the statute. For instance, in *Hodges*, the circuit court disallowed the plaintiff's third-party claim after finding that there was no implied right of action. 728 F.2d at 416. It held that such a claim was "but another aspect of the implied right of action argument." *Id.* Similarly, in *Wogan*, the court held that "[n]othing in the contract creates liability outside the Medicare Act. Because the Act does not confer a private right of action to sue . . . , we refuse to allow an action . . . on the ground [that the defendant] breached his contract" to comply with the Act. 623 S.E.2d at 119.

{85}     The MCOs would have us adopt the reasoning of those jurisdictions as discussed above, which disallows third-party beneficiary claims of this type. We refuse to do so. The court in *Dierkes* reasoned:

> [The] plaintiffs are not suing solely for [the defendant's] violation of [the statute], although compliance with that section becomes an element of the claim to the extent it is part of [the defendant's] promise. Instead, [the] plaintiffs are suing for . . . breach of contract, . . . [a] claim[] existing independent of the foregoing statute.

991 S.W.2d at 668.

{86}     The contract specifically includes the statutory requirement for payment to Plaintiffs pursuant to law. Plaintiffs seek to enforce this contract on a third-party beneficiary theory. Plaintiffs are not foreclosed from asserting a third-party beneficiary contract claim just because they may not do so directly under Section 27-2-16(B) when operation of the statute appears to be written as a contractual requirement for their reimbursement.

{87}     In looking at Plaintiffs' third-party beneficiary claim in this case, the district court began by asking why HSD entered into contracts with the MCOs "in the first place." It then found, based on an interpretation of Section 27-2-16(B) and by analogy to cases from other jurisdictions, that the statute expresses a motivation to serve "the medical needs of the aged, blind, and disabled. This [motivation] makes it apparent that the beneficiaries of these services are Medicaid enrollees, not providers." Finally, though not completely clear from the record, the conclusion that the statute was intended to benefit Medicaid enrollees led the district court to reason that the contract term incorporating it could not have been intended to benefit Plaintiffs. The district court stated that "Plaintiffs are not third[-]party beneficiaries to the contracts between HSD and the MCOs[.]" We hold that this finding requires reversal.

{88}     As we discussed above, when a district court considers a motion for judgment on the pleadings, it must "accept as true all facts well pleaded and question only whether the plaintiffs might prevail under any state of facts provable under the claim." *Garcia*, 106 N.M. at 760, 750 P.2d at 121. In their fourth amended complaint, Plaintiffs argue that "HSD has entered into valid written contracts with the MCOs for implementation of the managed care program[.]" Furthermore, Plaintiffs assert that they "are third[-]party beneficiaries under

[those contracts] as the unambiguous language of such contracts governs the benefits received by Plaintiffs in dispensing prescription medicines to Medicaid recipients."

**{89}** By finding that the Medicaid program as a whole was intended to benefit only Medicaid enrollees, the district court decided the merits of the third-party beneficiary claim. Essentially, it ruled on the intent of HSD and the MCOs in bargaining for the inclusion of the term in the contract. We hold that such a finding was a factual determination inappropriate to decide in a judgment on the pleadings. We reverse the district court on this issue and remand for additional factual development. Though we do not reach the merits of the issue, at this point, we see no reason why the contract term could not have been intended to benefit *both* Medicaid recipients *and* Plaintiffs. Certainly, if Medicaid recipients are to receive prescription medication, the participation of Plaintiffs is essential to the proper functioning of the system, and it is for this reason that we are unpersuaded by Defendants' arguments against the recognition of a third-party claim.

**F.      Plaintiffs May Bring the Unjust Enrichment Claim**

**{90}** Plaintiffs sued the MCOs for unjust enrichment, alleging that "the MCOs failed to pay Plaintiffs the reimbursement rates to which they were entitled under [Section] 27-2-16(B) and were [thus] unjustly enriched by the amount of Medicaid reimbursements they wrongfully withheld[—]the difference between what [Section] 27-2-16(B) required and what they paid." The district court dismissed Plaintiffs' unjust enrichment claim on the ground that a contract existed between Plaintiffs and the MCOs and between the MCOs and HSD, barring equitable relief. The court subsequently dismissed Plaintiffs' contractual claims.

**{91}** Unjust enrichment allows recovery by an aggrieved party from another who has profited at the aggrieved party's expense. *Heimann v. Kinder-Morgan CO2 Co.*, 2006-NMCA-127, ¶ 20, 140 N.M. 552, 144 P.3d 111. In order to state a claim for unjust enrichment against the MCOs, Plaintiffs are required to allege, first, that the MCOs knowingly benefitted at Plaintiffs' expense and, second, that allowing the MCOs to retain this benefit would be unjust. *Id.* That Plaintiffs had a contractual relationship with the MCOs does not foreclose a claim for unjust enrichment. *See Danley v. City of Alamogordo*, 91 N.M. 520, 521, 577 P.2d 418, 419 (1978) (holding that a builder was free to pursue an unjust enrichment claim despite the fact that it was in privity with the defendant); *Platco Corp. v. Shaw*, 78 N.M. 36, 37, 428 P.2d 10, 11 (1967).

**{92}** Plaintiffs argue that the district court improperly dismissed their claim for unjust enrichment, and we agree. In its order granting Presbyterian's 2006 motion for judgment on the pleadings, the court dismissed Plaintiffs' claim because it found they possessed "a complete and adequate remedy at law. . . . In this case, the party's actions are regulated by a contract [between the MCOs and HSD,] and Plaintiffs are seeking damages for breach of that contract." (Internal quotation marks and citation omitted.) Thus, the district court dismissed Plaintiffs' unjust enrichment claim because it considered it "legally insufficient."

**{93}** To support its conclusion, the district court relied on *Sims v. Sims*, 1996-NMSC-078, ¶ 28, 122 N.M. 618, 930 P.2d 153, but that case is not dispositive on these facts. In *Sims*,

our Supreme Court considered the issue of whether the existence of a statutory cause of action foreclosed a traditionally recognized equitable claim. *Id.* ¶ 17. Holding that equity remained available in such a situation, the Court concluded that "[t]here is no requirement that the creation of a statutory remedy at law for a particular type of claim will automatically supplant an equitable remedy that addresses the same claim. [Any] major departure from the long tradition of equity practice should not be lightly implied." *Id.* ¶ 29 (internal quotation marks and citations omitted). Likewise, as the Court held in *Hydro Conduit Corp. v. Kemble*, 110 N.M. 173, 178, 793 P.2d 855, 860 (1990), "unjust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the other two principal grounds for such liability, contract and tort." *See Tom Growney Equip., Inc. v. Ansley*, 119 N.M. 110, 112, 888 P.2d 992, 994 (Ct. App. 1994).

**{94}**     Thus, dismissal of Plaintiffs' claim for unjust enrichment on Presbyterian's motion for judgment on the pleadings was error. Plaintiffs assert that the MCOs entered into valid contracts with HSD, ones in which the MCOs promised to pay in accordance with Section 27-2-16(B). Plaintiffs allege further that HSD paid the MCOs to comply with the statute, but that those payments were at least partially retained by them. Such pleadings are enough to state a claim in equity for unjust enrichment, and the fact that Plaintiffs had contracts with the MCOs does not work to automatically foreclose it. Our system explicitly provides for alternative pleading of civil claims. Rule 1-008(E)(2) NMRA. We therefore leave open their claim for unjust enrichment.

## G.     Declaratory and Injunctive Relief Was Properly Denied

**{95}**     Finally, Plaintiffs argue that their demands for declaratory and injunctive relief were improperly dismissed by the district court. We disagree. Our Supreme Court has held:

> It is the general rule that the granting of declaratory relief is discretionary, under both the federal and the state acts. Whether such jurisdiction is to be entertained rests in the exercise of sound judicial discretion by the [district] court, and its decision will not be disturbed on appeal, in the absence of a clear showing of abuse of that discretion.

*Allstate Ins. Co. v. Firemen's Ins. Co.*, 76 N.M. 430, 434, 415 P.2d 553, 555 (1966) (internal quotation marks and citation omitted). Furthermore, injunctive relief is a harsh, drastic remedy that a district court "should issue only in extreme cases of pressing necessity and only where there is a showing of irreparable injury." *Leonard v. Payday Prof./Bio-Cal Comp.*, 2008-NMCA-034, ¶ 14, 143 N.M. 637, 179 P.3d 1245 (internal quotation marks and citation omitted). The district court in this case acted within its discretion having already entered an order keeping Plaintiffs' statutory entitlement alive, allowing access to a measure of relief that perhaps might exceed the reach of declaratory or injunctive judgments. Plaintiffs' demands for injunctive and declaratory relief essentially sought to remedy the underlying substantive claims. Because the outcomes of those substantive issues were unclear at the time the district court considered these equitable remedies, the district court did not abuse its discretion in denying them.

**H.      Class Certification Was Proper**

{96}    Because we reverse in part the orders of the district court, we now consider Cimarron's conditional cross-appeal.  Specifically, Cimarron makes two arguments that Plaintiffs' class was improperly certified.  First, Cimarron claims that allowing the MCOs to be added as Defendants after the original class certification results in a violation of its constitutional due process rights.  Second, Cimarron claims the district court improperly applied the requirements for class certification under Rule 1-023 NMRA.  We affirm the certification.

{97}    Decisions to certify a class are reviewed for abuse of discretion.  Abuse occurs when the district court "misapprehends the law or if [its] decision is not supported by substantial evidence." *Brooks v. Norwest Corp.*, 2004-NMCA-134, ¶ 7, 136 N.M. 599, 103 P.3d 39. "Within the confines of Rule 1-023, the district court has broad discretion whether or not to certify a class." *Id*.  The rule lists four prerequisites to certification of a class action:

> (1)      [Numerosity:]  the class is so numerous that joinder of all members is impracticable;
>
> (2)      [Commonality:]  there are questions of law or fact common to the class;
>
> (3)      [Typicality:]  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)      [Adequacy of representation:]  the representative parties will fairly and adequately protect the interests of the class.

*Ferrell v. Allstate Ins. Co.*, 2008-NMSC-042, ¶ 9, 144 N.M. 405, 188 P.3d 1156 (internal quotation marks and citation omitted).  Litigants attempting to certify a class must also meet one of three requirements under Rule 1-023(B).  In this case, the pertinent requirement is that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Rule 1-023(B)(3).  In certifying the class, the district court "must engage in a rigorous analysis of whether the Rule's requirements have actually been met." *Ferrell*, 2008-NMSC-042, ¶ 8 (internal quotation marks and citation omitted).

{98}    As we stated above, the court certified the class in this case before the MCOs were added as Defendants.  Thereafter, Plaintiffs, unopposed by HSD, argued that the MCOs were indispensable parties by virtue of the changed Medicaid administrative and payment scheme. They persuaded the district court to allow amendment of their complaint.  The MCOs attacked the class certification.  They filed briefs asking the court to decertify the class and included a number of supporting exhibits.  As a result, the district court allowed discovery into "whether the class should be decertified."  After hearing oral arguments on the issue, the district court concluded that the class certification was proper.  The court stated that

"[a]fter a review of the various motions to decertify the class, determine it to be void, to dismiss and to sever, I have determined that those motions will be denied."

**{99}** Cimarron argues that this scenario gives rise to a due process violation. We disagree. As case law demonstrates, post-certification amendments to include additional defendants typically only violate due process where the subsequently added defendants do not receive an adequate opportunity to contest the certification and the allegations against them. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1075, 1086 (6th Cir. 1996) (holding that the additional defendants could not be added after original class certification without having time to contest the certification); *Van Vels v. Premier Athletic Ctr. of Plainfield, Inc.*, 182 F.R.D. 500, 506-07 (W.D. Mich. 1998) (allowing post-certification amendment to include the additional defendants as long as they were given additional time for discovery and dispositive motions); *see Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977) (concluding that courts may not "rule on the class action question without affording the parties notice and an opportunity to make a record on the issue" and stating that "[t]he propriety of class action status can seldom be determined on the basis of the pleadings alone").

**{100}** Both Plaintiffs and Cimarron cite *In re Am. Med. Sys.*, Inc., 75 F.3d at 1086, and we too believe that case provides the appropriate analytical framework for these facts. There, the plaintiffs received class certification, and the next month they moved to amend their complaint to include an additional defendant. *Id*. at 1075. Then, "[w]ithout any further discovery, briefing, or argument, the district judge issued an amended order of class certification." *Id.* The newly added defendant appealed, and the Sixth Circuit held that "[t]he district [court] failed in its duty to conduct a rigorous analysis . . . and clearly abused its discretion." *Id.* at 1086 (internal quotation marks omitted). Such a defendant must receive a meaningful opportunity to respond to the complaint, a chance to conduct discovery, time to brief the issues, and a hearing in which the issue may be argued. *Id.*

**{101}** Each of the above requirements were met in the present case. Once the district court granted Plaintiffs' motion to amend their complaint, the MCOs almost immediately challenged the class certification. The district court granted discovery to the MCOs on the issue of "whether, under the [s]econd [a]mended [c]omplaint, Plaintiffs have abandoned the class certification against the [s]tate . . . and whether the MCOs, as new Defendants, are subject to the previous class certification[.]" Likewise, a hearing was held where the parties were given an opportunity to argue the issue and, on June 5, 2003, more than two years after Plaintiffs moved to add the MCOs as Defendants, the district court held that class certification was proper as to the MCOs. Under such conditions, where the MCOs had adequate notice and a chance to fully respond, we hold that no violation of their due process rights occurred.

**{102}** We are similarly unpersuaded by Cimarron's argument that the burden of proof as to class certification was unlawfully shifted to their shoulders. Our Supreme Court held:

> We can properly consider only those facts which appear in the transcript on appeal, which in this case is identical with the record proper in the district court. Upon a doubtful or deficient record[,] we indulge every

presumption in support of the correctness and regularity of the decision of the trial court. Every reasonable intendment and presumption are resolved in favor of the proceedings and judgment in that court.

*State ex rel. Alfred v. Anderson*, 87 N.M. 106, 107, 529 P.2d 1227, 1228 (1974) (citations omitted).

**{103}** Given that Cimarron provides us with no citations to the record tending to prove its allegation, we must presume that the district court applied the correct burden of proof, requiring Plaintiffs to establish that class certification remained proper after the MCOs were added. *See Brooks*, 2004-NMCA-134, ¶ 10 (stating that the plaintiffs beared the burden of proof to demonstrate that the requirements of Rule 1-023 were met).

**{104}** We also hold that the district court did not abuse its discretion in its application of Rule 1-023. Plaintiffs clearly have standing to sue. They meet the requirements of numerosity, commonality, typicality, and adequacy of representation. Furthermore, it is clear to us that the Rule 1-023(B)(3) requirements of predominance and superiority were satisfied. Substantial evidence supports the district court's conclusions on these matters.

**{105}** The requirements of standing have been met. In order to demonstrate standing, a plaintiff must demonstrate "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Forest Guardians v. Powell*, 2001-NMCA-028, ¶ 16, 130 N.M. 368, 24 P.3d 803 (internal quotation marks and citation omitted). Standing is a "threshold legal issue" to class certification. *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1022 (11th Cir. 1996). Cimarron alleges that because Plaintiffs contracted with the PBMs and not directly with the MCOs themselves, they lack standing to sue. This proposition is unsupported by precedent in Cimarron's briefs. Indeed, Plaintiffs alleged direct economic injuries against HSD and the MCOs because they were paid less than the statutory requirement. Such injuries were allegedly attributable to actions of either HSD, the MCOs, or both, and would presumably be cured if those parties were required to pay. That some Plaintiffs were required to contract with a PBM who, in turn, contracted with an MCO, does not defeat standing. In such a situation, a causal connection between the injury and challenged conduct may still exist and because the MCOs provide no law to the contrary, we hold that standing is not defeated by the mere existence of contracts between Plaintiffs and the PBMs. By the same token, some Plaintiffs had a direct relationship with an MCO; all allege the same right to payment of Medicaid reimbursement monies.

**{106}** We hold that substantial evidence supports the district court's conclusions as to numerosity, typicality, commonality, and adequacy of representation. Rule 1-023(A). This case provides an almost textbook example of a case proper for class certification. First, the rule requires that the number of potential plaintiffs be so high "that joinder of all members is impracticable[.]" Rule 1-023(A)(1). During class certification, Plaintiffs estimated that the number of potential plaintiffs would be between two and three hundred. Further, those potential plaintiffs were widely dispersed across the entire state. In the event that

certification had been denied, those potential plaintiffs would have been greatly inconvenienced by having to individually join in the litigation, many from remote locations. Second, the rule requires that there be "questions of law or fact common to the class[.]" Rule 1-023(A)(2). Here, each class member argues that Section 27-2-16(B) allows for certain rights under both the statute and common law. The relationship of each with both HSD and the MCOs, and the facts necessary to decide the case as to each class member, is essentially identical. *See Cottrell v. Lopeman*, 119 F.R.D. 651, 657 (S.D. Ohio 1987) (stating that commonality is met where a regulatory scheme common to all class members has been established). Third, the rule requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class[.]" Rule 1-023(A)(3). Each member in this class seeks an interpretation of Section 27-2-16(B) that will require either HSD or the MCOs to pay. Likewise, each seeks damages, though injured in a different sum, to recover the money that went unpaid under the statute. Fourth, Rule 1-023(A)(4) requires that "the representative parties [must] fairly and adequately protect the interests of the class." No evidence was presented below establishing that the interests of any individual class members were contrary to those of the entire class. Furthermore, counsel for Plaintiffs demonstrated that they were qualified and experienced enough to conduct the representation. When the MCOs were added as Defendants, little changed. Plaintiffs again asserted claims based on a common statute and involving a common set of factual circumstances. Under those conditions, we hold that the district court did not abuse its discretion in finding that the requirements of Rule 1-023(A) were met.

{107} Nor did it abuse its discretion in finding that the requirements of predominance and superiority were met. Under Rule 1-023(B)(3), the district court is required to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Cimarron asserts that because Plaintiffs in this case dealt with many different PBMs and because each suffered a different amount of economic injury, individual issues predominate over the larger issues of the class as a whole. This disregards the big picture of the issue at stake, and we disagree. "A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions." *Armijo v. Wal-Mart Stores, Inc.*, 2007-NMCA-120, ¶ 32, 142 N.M. 557, 168 P.3d 129 (internal quotation marks and citation omitted). Such is the case here, where the claims of each class member involve a statutory interpretation of Section 27-2-16(B), a determination of whether that statute survived the transition to managed care, and a conclusion as to the legal effect of that statute's inclusion in contracts between HSD and the MCOs. Certainly, minor differences will exist among class members in this case, but the critical issues described above remain operative and predominate among all class members. In other words, in order to prevail, each class member will need a holding as to the major issues common to all. Each can then demonstrate the extent of its injury. Those are considerations far removed from a judgment on the pleadings.

{108} We find nothing in the record to indicate the existence of any class member interested in maintaining a separate action. Judicial resources will be saved by certification,

the number of class members is manageable, and the damages of each class member can be calculated in a similar manner.

{109} In addition, Cimarron contends that the class certification resulted in "one-way intervention." Cimarron argues that Plaintiffs' decision to submit their motion for partial summary judgment for resolution after the original class certification, but before joining the MCOs, constituted impermissible "one-way intervention." One-way intervention is the principle that potential members of a class may not wait until after the resolution of the case on the merits before joining the class. *Valley Utils., Inc. v. O'Hare*, 89 N.M. 262, 264-65, 550 P.2d 274, 276-77 (1976). To do so would be to "invite[] non[-]participating parties to share in the spoils of a judgment obtained by others even though those absent parties will not be bound by the judgment if they [subsequently] decide to bring another action." *Id.* at 265, 550 P.2d at 276.

{110} Cimarron fails to explain how one-way intervention is applicable to this situation, citing case law that expressly applies the principle solely to intervening plaintiffs in class actions. *See id.* at 264, 550 P.2d at 276 (holding that "only those members of [the plaintiff] class who joined the suit prior to the verdict are either bound by it, or allowed to benefit from it"); *see also Peritz v. Liberty Loan Corp.*, 523 F.2d 349, 353-54 (7th Cir. 1975) (describing one-way intervention as the problem created by potential class members waiting for a resolution of the merits before deciding to join the lawsuit). One-way intervention is inapplicable here as non-parties are not attempting to intervene and share in the spoils of a judgment already obtained by others in this case.

{111} As part of this one-way intervention argument, Cimarron further contends that Plaintiffs received "an impermissible preview of the merits before obtaining class certification binding all . . . parties in the case" because Plaintiffs obtained a partial decision on the merits that "[Section] 27-2-16(B) . . . applied to the pharmacy contracts at issue[.]" Even though the court decided that the statute applied to pharmacy contracts, this decision about a threshold legal matter was outside the scope of prohibited one-way intervention. As stated above, our Supreme Court prohibits the practice of intervention after a final judgment has been rendered, so as to prevent non-participating prospective plaintiffs from sharing in the "spoils of a judgment." *Valley Utils.*, 89 N.M. at 265, 550 P.2d at 277. The judgment at issue here was about a threshold legal matter that did not result in a final judgment against HSD or the MCOs. Thus, Plaintiffs' litigation of Section 27-2-16(B)'s applicability, prior to joining Cimarron, did not result in one-way intervention. One-way intervention is inapplicable to both the facts of this case and the decision at issue.

## IV. CONCLUSION

{112} Based on the foregoing analysis, we affirm in part, reverse in part, and remand this case for further proceedings.

{113} **IT IS SO ORDERED.**

---

**RODERICK T. KENNEDY, Judge**

**WE CONCUR**:

_____
**MICHAEL D. BUSTAMANTE, Judge**


_____
**JONATHAN B. SUTIN, Judge**

**Topic Index for** _Starko, Inc. v. Presbyterian Health Plan, Inc._, **Docket Nos. 27,992/29,016**

| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |

| **CP** | **CIVIL PROCEDURE** |
| CP-CA | Class Actions |
| CP-IJ | Injunctions |
| CP-SJ | Summary Judgment |
| CP-WA | Waiver |

| **CN** | **CONTRACTS** |
| CN-BF | Beneficiaries |
| CN-BR | Breach |
| CN-TB | Third Party Beneficiary |
| CN-WV | Waiver of Rights |

| **IN** | **INSURANCE** |
| IN-HI | Health Insurance |
| IN-HO | Health Maintenance Organizations |

| **JM** | **JUDGMENT** |
| JM-DJ | Declaratory Judgment |

| **PA** | **PUBLIC ASSISTANCE** |
| PA-MM | Medicare and Medicaid |

| **RE** | **REMEDIES** |
| RE-UE | Unjust Enrichment |

| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |